# EXHIBIT  1

**IN THE DISTRICT COURT OF KAY COUNTY**
**STATE OF OKLAHOMA**

Filed in the DISTRICT COURT
Kay County, Oklahoma

MAY 2 3 2012

MARY RAMEY, Court Clerk
BY_____ DEPUTY

| | |
|---|---|
| BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF KAY, OKLAHOMA; | ) )  ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| FREEPORT-MCMORAN COPPER & GOLD INC.; FREEPORT-MCMORAN CORPORATION f/k/a PHELPS DODGE CORPORATION; CYPRUS AMAX MINERALS COMPANY; and BLACKWELL ZINC COMPANY, INC.; | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Case No. CJ 2012-74

## ORIGINAL PETITION

COMES NOW Plaintiff, the Board of County Commissioners of the County of Kay, Oklahoma ("Board"), and for its Original Petition against Defendants, alleges and states as follows:

### PARTIES AND JURISDICTION

1.     KAY COUNTY, OKLAHOMA (the "County"), is a body corporate and politic, and is empowered to sue pursuant to 19 Okla. Stat. § 1(1).  The powers of the County are by law exercised by the Board pursuant to 19 Okla. Stat. § 3.  The Board is the appropriate entity to take any legal action on behalf of the County pursuant to 19 Okla. Stat. § 4.

2.     Defendant FREEPORT-MCMORAN COPPER & GOLD INC. ("FCX") is a foreign corporation organized and existing under the laws of the State of Delaware with its principal place of business in Phoenix, Arizona.  FCX is authorized to do business in Oklahoma. FCX acquired Defendant Freeport-McMoRan Corporation, formerly known as Phelps Dodge

Corporation, in March 2007, at which time Freeport-McMoRan Corporation became a wholly-owned subsidiary of FCX. Since the acquisition of Freeport-McMoRan Corporation, FCX has actively performed, or caused to be performed, individually and/or through its corporate affiliates, all obligations of Defendant Blackwell Zinc Company related to the Blackwell Zinc Smelter (the "Smelter") and the related Oklahoma Department of Environmental Quality ("DEQ") cleanup site (the "Site"), and has, through its actions, conduct, and representations to the State of Oklahoma, DEQ, and the Blackwell community, accepted responsibility for all cleanup, remediation, and damages associated with the historical operations of the Smelter.

3.      Defendant FREEPORT-MCMORAN CORPORATION, formerly known as PHELPS DODGE CORPORATION ("FMC"), is a foreign corporation organized and existing under the laws of the State of New York with its principal place of business in Phoenix, Arizona. FMC acquired Defendant Cyprus Amax Minerals Company in 1999, at which time Cyprus Amax Minerals Company became a wholly-owned subsidiary of FMC. Since the acquisition of Defendant Cyprus Amax Minerals Company, FMC has actively performed, or caused to be performed, individually and/or through its corporate affiliates, all obligations of Defendant Blackwell Zinc Company related to the Smelter and the related Site, and has, through its actions, conduct, and representations to the State of Oklahoma, DEQ, and the Blackwell community, accepted responsibility for all cleanup, remediation, and damages associated with the historical operations of the Smelter.

4.      Defendant CYPRUS AMAX MINERALS COMPANY ("Cyprus Amax") is a foreign corporation organized and existing under the laws of the State of Delaware with its principal place of business in Phoenix, Arizona. Cyprus Amax was established through the merger of Cyprus Minerals Company and Amax, Inc. Defendant Blackwell Zinc Company was

2

formerly a wholly-owned subsidiary of Amax, Inc., formerly known as American Metal Climax, Inc., formerly known as The American Metal Company, and became a wholly-owned subsidiary of Cyprus Amax as a result of the merger.  Amax, Inc. no longer exists as an entity as a result of the merger, and its liabilities and obligations have been assumed by Cyprus Amax.  Since the merger, Cyprus Amax has actively performed, or caused to be performed, individually and/or through its corporate affiliates, all obligations of Defendant Blackwell Zinc Company related to the Smelter and the related Site, and has, through its actions, conduct, and representations to the State of Oklahoma, DEQ, and the Blackwell community, accepted responsibility for all cleanup, remediation, and damages associated with the historical operations of the Smelter.

5.    Defendant BLACKWELL ZINC COMPANY, INC. ("BZC") is a corporation organized and existing under the laws of the State of New York.  BZC's principal place of business for the purpose of determining diversity jurisdiction is, and has been judicially determined to be, Blackwell, Oklahoma.  BZC formerly owned and operated the Smelter from 1916 to 1974.  Although it ceased commercial operation of the Smelter in 1974, BZC continues to transact business in Oklahoma for the purposes of conducting remediation activities associated with its former Smelter operations in Oklahoma and recently filed an application for a permit to operate a groundwater treatment plant in Oklahoma.  Oklahoma is the state in which BZC last transacted business prior to closing its commercial operations at the Smelter and participating in such cleanup.  BZC is authorized to do business in Oklahoma and may be served with process by serving its registered agent for service of process, The Corporation Service Company, at 115 S.W. 89th Street, Oklahoma City, Oklahoma 73139.  BZC is a wholly-owned subsidiary of FMC, formerly Phelps Dodge Corporation, which is a wholly-owned subsidiary of FCX.  Defendants,

3

jointly and severally and/or as alter egos of one another, are responsible for the obligations of BZC related to the Smelter and the related Site.

6.    As a court of general jurisdiction, this Court has jurisdiction over the claims asserted herein pursuant to OKLA. CONST. art. VII, § 7. All claims and counts asserted herein are brought under the laws and statutes of the State of Oklahoma. No claims asserted herein are intended to address violations (or potential violations) of any federal statute or Constitutional provision.

7.    Further, this Court has specific jurisdiction over this matter pursuant to 50 Okla. Stat. § 17, in order to abate the nuisance described herein.

8.    This Court has personal jurisdiction over Defendants by virtue of the extensive amount of business they have conducted within this state and because the specific conduct at issue occurred in the State of Oklahoma. Defendants are amenable to service under the Oklahoma long-arm statute. The exercise of personal jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice as Defendants have minimum contacts with the State of Oklahoma. Defendants have purposefully availed themselves of the privilege of conducting activities within the State of Oklahoma, thereby invoking the benefits and protections of its laws.

9.    Venue is proper in Kay County, Oklahoma, pursuant to 12 Okla. Stat. §§ 131, 137, and 139.

## FACTUAL ALLEGATIONS

10.      Kay County is located in north-central Oklahoma.  The County covers approximately 919 square miles and, as of July 2009, has a population of roughly 46,110.  The County is home to Blackwell, which has a population of roughly 7,200, or approximately 15% of the County's total population.

11.      The Board has exclusive authority to designate, construct, maintain, and repair all county roads under 69 Okla. Stat. § 601 ("It shall be the duty of the board of county commissioners in each county to construct and maintain as county highways those roads which best serve the most people of the county.").  The Board has considerable discretion in the exercise of its jurisdictional powers over county roads.  All section lines opened and maintained by the Board are "public roads."  *See* 69 Okla. Stat. § 1201.  Most of the section line roads in Kay County have been opened and maintained by the Board since statehood.  Unless specifically stated to the contrary, the County is responsible for maintaining a 66-foot right-of-way on all county roads (33 feet on either side from the center of the road).  The County currently maintains roughly 1,463 miles of county roads.

12.      The Board also has exclusive jurisdiction over the construction, maintenance, and repair of bridges located on and/or connecting county roads.  The County currently maintains approximately 426 bridges, approximately 288 of which are in excess of 20 feet long and, therefore, subject to regulation by the Oklahoma Department of Transportation.

13.      The County is divided into three (3) commission districts for purposes of assigning responsibility for maintaining and repairing county roads and bridges.  Blackwell is located in Kay County District No. 3, which is the largest of the three districts and comprises the

western portion of the County.  District 3 maintains roughly 647 miles of roads and 122 regulated bridges.

14.     From 1916 until 1974, BZC and/or its successors operated the Smelter on approximately 160 acres of land located near the intersection of 13th Street and State Highway 11 in Blackwell (the "Smelter property"). The Smelter was used to extract enormous quantities of zinc, cadmium, and other various byproducts from ore concentrates which came from various parts of the world.  The ore concentrates contained considerable amounts of zinc, arsenic, lead, cadmium, and other metals.  Millions of tons of zinc were produced over the operational life of the Smelter.  In 1957, BZC added a cadmium plant at the Smelter.  Both zinc and cadmium were processed in Smelter operations throughout the Smelter property.

15.     BZC's operation of the Smelter caused pollutants to be deposited on, beyond, and beneath the Smelter property.  Large piles of slag and other waste materials were regularly left exposed to the environment.  Air emissions from the Smelter's operations, in the form of both source and fugitive emissions, came to be deposited throughout the County, particularly in and around Blackwell.  Elevated levels of heavy metals (often substantially elevated), in particular zinc, cadmium, arsenic, and lead, from the Smelter are present in soils throughout the County.

16.     During operation of the Smelter, BZC openly and actively provided Smelter soil, dirt, slag, condensers, condenser (or "connie") sand, broken retorts, and other waste materials (collectively, "Smelter residues") to various third parties, including the County, rather than properly treating and/or disposing of such materials.  BZC maintained a staging and storage area for waste materials from the Smelter in the northeast corner of the site (along 13th Street and Doolin Avenue).  BZC used its own employees and equipment to load Smelter residues onto trucks and trailers belonging to the County, the City, and other entities and individuals (often

loading as many as 100 trucks in a single day). BZC employees would often take Smelter residues for their own private use as well.

17.    The Smelter residues were provided to the County, the City, and the public without any warning as to their heavy metal content which occurred as a result of the Smelter operations or any restrictions on their potential uses. It was common knowledge at BZC that the Smelter residues were used as fill in drainage ditches and around sewer lines, as base for the construction of roads, driveways, culverts, parking lots, and other surfaces, including the Blackwell High School running track, and for numerous other applications, and BZC encouraged the use of these materials for such purposes in the community. BZC employed engineers and metallurgists and was uniquely in the position to know of any hazards and dangers associated with the Smelter residues, and such knowledge and information was exclusively in Defendants' control at all times relevant hereto.

18.    Kay County was a primary recipient of the Smelter residues. Based upon information provided by current and former County employees and the presence of Smelter residues in and around bridges first installed in the 1930s, it is believed the County received much of the residues from near the time Smelter operations began in late 1916 until the Smelter finally closed in the mid-1970s. BZC encouraged a number of parties, including the County, to use the Smelter residues. Waste from the Smelter created a free and virtually endless supply of materials the County could use to construct and maintain its roads, culverts, and bridges. Kay County used Smelter residues, including connie sand, broken retorts, slag, and other refractory materials as road base, to fill in erosion holes, to build up low-lying areas, and as fill in and around bridges, culverts, and drainage ditches. Enormous amounts of Smelter residues were hauled by County trucks and used in County road and bridge projects. Smelter residues were

7

used in a significant portion of the County's roads, culverts, bridges, and other structures and are pervasive throughout the County. As it was BZC's business to extract metals from the raw ore, BZC was well aware of the dangerous metal content in its waste streams. Nonetheless, BZC permitted use of the Smelter residues by the County and other third parties as a means of disposal. The County was unaware of any potential harms associated with the use of such Smelter residues, and to its knowledge, BZC did nothing to advise or warn the County about the hazards of utilizing Smelter residues or to limit their use for any of these purposes.

19.     Faced with the prospect of expending significant amounts of money to comply with environmental regulations, in 1972, BZC began the process of closing the Smelter. By 1974, BZC had completely dismantled the Smelter and closed the facility. However, BZC did nothing to address the known pollution or contamination for many years – and Defendants have never made any meaningful efforts to investigate, assess, or remediate any visible Smelter residues or other related contamination found in the County, which is the primary focus of this lawsuit.

20.     In 1974, after closing and demolishing most of the buildings on the Smelter property and burying significant volumes of Smelter residues onsite, BZC conveyed the Smelter property (approximately 160 acres) to the Blackwell Industrial Authority ("BIA"). BIA is a statutory public trust organized and existing under the laws of the State of Oklahoma, 60 Okla. Stat. § 176 *et seq.*, whose sole beneficiary is the City. Since 1974, BIA has developed and leased the former Smelter property as an industrial park. The County owns approximately 5.77 acres of land on the former Smelter property; the Kay County District No. 3 office and "equipment barn" is located on this site.

8

21.   Extensive environmental investigations of the Smelter property and surrounding Site began in the early 1990s. In 1992, the U.S. Environmental Protection Agency ("EPA") conducted a soil sampling survey in Blackwell. Based upon its investigation, EPA suggested that the Smelter property and surrounding areas affected by contamination from the Smelter could become a Superfund site and be placed on the National Priorities List ("NPL"). In order to avoid any action by EPA at that time, BZC entered a Consent Agreement and Final Order ("CAFO") with the Oklahoma Department of Health (the predecessor to DEQ) in 1992 and committed to investigate and remediate the Smelter property as well as the surrounding area within the City of Blackwell. However, the County was not part of the CAFO, and it did not specifically apply to property outside the city limits of Blackwell within Kay County. Areas outside the city limits of Blackwell were not (and have not been) investigated, assessed, or remediated by Defendants under the CAFO.

22.   In 1994, DEQ developed and implemented a pilot cleanup project to ensure the environmental characterization and remediation work conducted at the Smelter property was conducted in a manner consistent with EPA's Superfund program. As has been judicially determined in other litigation to which Defendants are parties, all cleanup activities associated with the Smelter have been, and are being, conducted pursuant to State authorities and supervision and, therefore, DEQ's action related to the Smelter is not a federal "CERCLA cleanup," as defined by and subject to 42 U.S.C. §§ 9601 *et seq*. Moreover, no formal action has been taken by any regulatory agency within the County.

23.   Following entry of the CAFO, Cyprus Amax – on behalf of BZC – conducted an environmental investigation in Blackwell in the area on and surrounding the Smelter property under the supervision of DEQ. The resulting investigation revealed significant contamination of

the soils both on the Smelter property and elsewhere within the community, groundwater contamination underlying much of the City, and several areas of potential impacts to surface water. Little, if any, attention was given to County properties or other areas beyond the Blackwell city limits; areas beyond the city limits of Blackwell were not (and have not been) investigated, assessed, or remediated by Defendants under the CAFO or otherwise.

24.     Lead, cadmium, arsenic, and zinc associated with Defendants' operation of the Smelter were found in the soils both on the Smelter property and beyond. Smelting operations and airborne emissions were the primary cause of the dispersion of these hazardous materials both on-site and beyond the Smelter property. Additionally, solid waste Smelter residues were physically moved both on and off the Smelter property for use as fill and for other purposes.

25.     In April 1996, DEQ issued a Record of Decision Document, Soil Remediation Unit (the "Soil ROD"), which required Defendants to remediate soils to mandated cleanup levels for lead, cadmium, and arsenic. DEQ determined that a significant portion of the Site was contaminated through historical aerial deposition of metals from the smelting operations and transport of solid waste materials and residues from the Site. In the Soil ROD, DEQ identified a number of historical sources of metals at the Smelter, including ore concentrates delivered to the Smelter by rail car, dust from the transport and storage of ore concentrates and solid waste materials at the facility, metals emissions from roasting and smelting processes, airborne particulates from smelting and sintering processes, and various solid waste materials, such as retort and sinter residues, slag, crushed retorts, and condenser sands.

26.     The Soil ROD did not specifically address any remedial action or investigation to be taken in the County (and subsequent work has been focused on areas within the city limits of Blackwell). However, recognizing the significance and potential harm associated with Smelter

residues which had been transported to and placed in areas beyond the Smelter property, the Soil

ROD provided as follows:

> As the Remedial Design and Remedial Action progress, **areas where smelter residues were transported and remain exposed or have insufficient cover will be identified.** Specific steps to be taken to identify smelter residues that remain exposed or have insufficient cover shall be included in the Remedial Design for the Soil Remediation Unit. Such steps shall include solicitation of information from the public. Any areas that are identified as containing smelter residues **shall be evaluated** to determine whether they continue to pose a significant hazard. If such areas are identified, then they **shall be addressed** as part of the Soil Remediation Unit in a manner that will eliminate or reduce the potential for exposure to an acceptable level.

Soil ROD, at 22 (emphasis added). DEQ indicated it was "not going to worry about" Smelter

residues found beneath any asphalt or cement cap, such as beneath a paved street or road. *Id.*, at

32 (Responsiveness Summary). However, very few of the County's roads are paved or covered

with an asphalt or cement cap, or ever have been, and despite the County's best efforts and

expenses incurred to maintain an adequate cover of aggregate or other materials on its roadways,

Smelter residues remain exposed and/or insufficiently covered even though the Smelter shut

down over 37 years ago. To this day, Defendants have never taken any appropriate action to

identify, evaluate, or address Smelter residues which remain exposed or have insufficient cover

in any County roads, bar ditches, culverts, bridges, or other structures. Nor have Defendants

conducted any appropriate evaluation or analysis to demonstrate that the Smelter residues present

and visible in the County no longer continue to pose a significant hazard.

     27.    Visible Smelter residues and soil contaminated with elevated levels of lead,

cadmium, arsenic, and zinc, all as a result of Smelter operations, have been identified on

properties owned, operated, and/or maintained by the County. Nearly all of these Smelter

residues and this contaminated soil has not been – and will not be – remediated as part of

Defendants' soil cleanup efforts under DEQ supervision. Thus, the County regularly encounters

Smelter residues in repairing and maintaining its roads and bridges. County workers who conduct maintenance and other routine activities on County roads and other properties are constantly exposed to Smelter residues, contaminated soils, and other potentially hazardous materials, which may require them to be specially trained and, depending on the circumstances, to wear protective clothing to perform their work. In particular, grader operators continuously encounter additional Smelter residues brought to the surface as part of their routine maintenance on the roads. The County is, has been, and will continue to be, subjected to significantly inflated costs associated with operations and maintenance because of the contamination. The County also has incurred, and will continue to incur, increased costs for public works projects, such as due to hazardous materials handling requirements imposed on its contractors as well as additional training for its inspectors.

28.     In 2000, DEQ took soil samples from bar ditches in Grant County, Oklahoma, located immediately to the west of Kay County. DEQ found contamination consistent with Smelter operations (*e.g.*, elevated metal contents, particularly of zinc and lead), most of which did not exceed the residential cleanup levels applicable with the City of Blackwell. DEQ accepted Grant County's proposal to reuse such materials by placing contaminated soils from the bar ditches back onto the county roads away from residential properties and keeping them adequately covered. DEQ provided the results of its sampling to Defendants. Despite Defendants' knowledge of Smelter residues located in Kay and Grant County, Defendants never took any action to investigate, assess, or remediate any Smelter residues located beyond the Blackwell area.

29.     The hazardous substances generated through Defendants' operation of the Smelter have been and continue to be a source of harm to properties owned, operated, and/or maintained

by the County. The impact from the Smelter air emissions and waste disposal practices will remain in the County in perpetuity. These hazardous substances, including zinc, arsenic, lead, and cadmium, continue to harm and adversely effect the use of County property, diminishing its value and resulting in significant additional costs to the County, particularly as to work on roads, bar ditches, culverts, bridges, and other structures.

30.     Although nearly 40 years have passed since the close of the Smelter, and most of the Smelter residues provided to the County by Defendants was buried and covered, and notwithstanding the significant efforts taken and expenses incurred by the County to keep any Smelter residues adequately covered, Smelter residues are visible and remain exposed even today throughout the County's roads, bar ditches, culverts, bridges, and other structures. County employees have reported visually identifying the presence of Smelter residues in hundreds of locations as part of their normal operations since January 1, 2012 – and the list continues to grow daily. The County has physical confirmation of Smelter material from the Kansas border (13 miles north of the Smelter site) to the Kay-Noble County line (15 miles south of the Smelter site) and from the Kay-Grant County line (9 miles west of the Smelter site) at least to north of Ponca City (roughly 8 miles east of the Smelter site). In addition to these visible confirmations, current and former County employees have identified numerous other areas where Smelter residues were used but are not currently visible at the surface. The extent and pervasiveness of Smelter residues within Kay County, as well as the size of the County's road system and the County itself, make it impractical to identify all the locations where Smelter residues are present. However, it is anticipated that upon further investigation, it will be shown that a significant portion of Kay County's roads, bar ditches, culverts, bridges, and other structures is contaminated with Smelter residues associated with Defendants' operations.

13

31.    Smelter residues contain elevated (often substantially elevated) amounts of heavy metals, including cadmium, arsenic, lead, and zinc.  Thus, Smelter residues which have been transported beyond the Smelter property and remain exposed to the environment create a significant hazard to public health and the environment, as has been previously determined by DEQ.  As a result, Defendants have agreed to remove all visible Smelter residues from residential, commercial, and public properties located within, and extending one mile beyond, the city limits of Blackwell (in 2009), as well as along certain surface water tributaries within the City (in 2011).  In fact, Defendants also committed to removing visible Smelter residues associated with another former smelter operation in Collinsville, Oklahoma (in 2010).  The presence of Smelter materials in and on County roads creates an even greater concern to human health and the environment because of the significant likelihood that the waste material will become crushed or ground up by vehicle traffic and potentially become airborne.  This concern for the County has intensified in the last several years as significant oil and gas development and other energy projects have begun within the County, substantially increasing the amount and frequency of heavy truck traffic.  Despite being aware of these concerns for many years, Defendants have knowingly, willfully, and arbitrarily drawn a line one mile beyond the Blackwell city limits and refused to remove (or fund the removal of) visible Smelter residues within Kay County.  In fact, based upon Defendant's conduct, it is the County's belief that Defendants were preparing to walk away from the Site in 2012 after resolving certain litigation involving Blackwell residents and ignore the Smelter residues and contamination in the County, but for the County's threat of litigation.

32.    As a result of the Smelter's operations and Defendants' conduct, Kay County is forever associated with Smelter pollution and residues left behind.  Indeed, Wikipedia and

14

numerous other web sites document the contamination left behind in the County as a result of the Smelter. In short, the second largest town within the County (Blackwell, which comprises over 15% of the County's total population) is best known for its pollution and contamination with Smelter residues. Additionally, population the County has failed to grow, or even maintain itself, since the closing of the Smelter. The overall County population has declined by roughly 10% since 1960. The effects have been felt in terms of new home construction as well as sales of existing homes. As a result, the County has been unable to maintain its population and tax base. The County has suffered significant economic damages associated with the pollution problem created and perpetuated by Defendants.

33. The wrongful conduct of Defendants as described herein constitutes a continuing violation in tort including nuisance and trespass. The County has been damaged and is continuing to be damaged by the wrongful acts of Defendants.

34. The pollution and contamination of groundwater, surface water, land, soils, and other resources within the County constitutes a nuisance. This nuisance affects the health, safety, and welfare of a significant portion of the County, including the entire community of Blackwell. Pollution of the waters of the State of Oklahoma, including groundwater, is against the public policy of Oklahoma, pursuant to 82 Okla. Stat. § 1084.1, and causing pollution of the air, land, or waters of the State, constitutes a public nuisance *per se*, pursuant to 27A Okla. Stat. § 2-6-105. The wrongful conduct of Defendants as described herein constitutes a public nuisance. Additionally, the public nuisance created by Defendants is ongoing and continuous to this day. Pursuant to 50 Okla. Stat. § 7, no lapse of time can legalize such a public nuisance because the nuisance amounts to an actual obstruction of a public right.

35.     Accordingly, the County brings this action for legal damages that would fully compensate it for all costs associated with Defendants' continued nuisance and trespass related to properties owned, operated, and/or maintained by the County as well as seeking abatement of such nuisance and the assessment of the costs of abating the public nuisance in the County against Defendants.

36.     As a direct and proximate result of the wrongful acts and omissions by the Defendants in contaminating the air, land, and water in the vicinity of the Smelter site, the County has suffered and will continue to suffer damages, costs, and expenses including, without limitation, the following:

a.      Damages to real property owned, operated, and/or maintained by the County that has been ruined, rendered less valuable, or otherwise adversely affected as a result of contamination from the Smelter and Defendants' failure to fulfill their responsibilities to clean up and forever eliminate all impacts and effects of the contamination;

b.      Damages the County has incurred or will incur for investigation, testing, and remediation of Smelter contamination on properties it owns, operates, and/or maintains, including but not limited to costs incurred hiring consultants, engineers, lawyers, etc., and to implement and manage work practice standards imposed, or to be imposed, on the County by DEQ because of Defendants' contamination;

c.      Damages due to increased costs associated with facilities and other resources owned, operated, and/or maintained by the County, including but not limited to its roads, bar ditches, culverts, bridges, and other structures;

d.      Economic and other damages, including but not limited to stigma damages, associated with the continued presence of Smelter contamination in the County, even after any efforts to remedy and/or abate the nuisance has taken or will take place;

e.      Additional costs associated with the presence of contaminated materials on property where the County conducts required operations and maintenance, including but not limited to the County's roads, bar ditches, culverts, bridges, and other structures;

16

f.    Damages suffered by the County in the form of the inconvenience, annoyance, and discomfort it has experienced for decades as a result of the wrongful actions of Defendants which harms and significantly interferes with the County's full use and enjoyment of its property, results in lost resources, and causes the County additional costs of maintenance and operation;

g.    Costs incurred, or to be incurred, to abate the nuisance created and maintained by Defendants;

h.    Equitable damages in the amount by which Defendants have been unjustly enriched at the expense of the County; and

i.    Punitive and/or exemplary damages.

## CAUSES OF ACTION

### First Cause of Action
### PUBLIC NUISANCE

37.    The County restates, alleges, and incorporates Paragraphs 1 – 36 the same as if fully set forth herein.

38.    Defendants have intentionally and/or negligently acted or failed to act so as to cause the release of hazardous substances from the Smelter property into the community as a whole, including property owned, operated, and/or maintained by the County. Such conduct affects at the same time a significant portion of the County, including the entire community of Blackwell, and constitutes a public nuisance under 50 Okla. Stat. § 2.

39.    By statute, Defendants' pollution of the waters of the State of Oklahoma, including groundwater, is against the public policy of Oklahoma, pursuant to 82 Okla. Stat. § 1084.1. Additionally, placing or causing any wastes to be placed in a location where they are likely to cause pollution of any air, land, or waters of the State constitutes a public nuisance *per se*, pursuant to 27A Okla. Stat. § 2-6-105. DEQ has previously declared contaminated soils associated with Defendants' actions to constitute a public nuisance.

40.     The County has the authority to pursue this action for abatement of the public nuisance and/or assessment of all costs associated therewith against Defendants jointly and severally.

### Second Cause of Action
### PRIVATE NUISANCE

41.     The County restates, alleges, and incorporates Paragraphs 1 – 40 the same as if fully set forth herein.

42.     Defendants have intentionally and/or negligently acted or failed to act so as to cause the release of hazardous substances from the Smelter property which has unreasonably interfered with the County's use of real property and facilities including, but not limited to, roads, bar ditches, culverts, bridges, and other structures, resulting in inconvenience, annoyance, and discomfort to the County, loss of use and value of property owned, operated, and/or maintained by the County, increased costs associated with County operations and maintenance, loss of use of the County's resources, and other injuries.

43.     Defendants' conduct is a direct and proximate cause of the injuries and damages suffered by the County.

44.     The County has incurred, and will continue to incur in the future, damages, costs, and expenses as a result of such private nuisance, for which the County is entitled to receive compensation and reimbursement from Defendants, jointly and severally.

### Third Cause of Action
### TRESPASS

45.     The County restates, alleges, and incorporates Paragraphs 1 – 44 the same as if fully set forth herein.

46.     Defendants' wrongful conduct was committed intentionally and knowingly, whether or not Defendants intended or knew of the consequences of their acts at the time they were committed.  These intentional activities have resulted and continue to result in the release of hazardous substances that have caused and will continue to cause an actual physical invasion of and interference with the County's property interests, including real property owned, operated, and/or maintained by the County and facilities including, but not limited to, roads, bar ditches, culverts, bridges, and other structures.  This actual and physical invasion of and interference with County property is ongoing and continues to this day.

47.     Defendants' conduct, including but not limited to air and fugitive emissions associated with Smelter operations, has occurred and continues to occur without permission, authority, or consent from the County.  Further, to the extent the County has consented to allow solid waste from the Smelter to be placed in, on, or around roads, bar ditches, culverts, bridges, and other structures, the County was induced to provide such consent by Defendants, who knowingly withheld information concerning the nature of the invasion and/or the extent of the harm to be expected from it.  At the time Smelter residues were provided to the County for its use, Defendants were in exclusive possession of knowledge and/or information regarding the true extent of the harm associated with such materials and knowingly induced the County to take such materials without charge, in lieu of requiring Defendants to properly treat or dispose of them.

48.     Defendants' conduct is a direct and proximate cause of the injuries and damages suffered by the County.

49.     The County has incurred, and will continue to incur in the future, damages, costs, and expenses as a result of such unauthorized trespass, for which the County is entitled to receive compensation and reimbursement from Defendants, jointly and severally.

### Fourth Cause of Action
### NEGLIGENCE

50.     The County restates, alleges, and incorporates Paragraphs 1 – 49 the same as if fully set forth herein.

51.     At all times material to this Petition, Defendants had a duty to conduct their operations at the Smelter property, including any remedial efforts since the Smelter was closed, in such a manner as to prevent the release of hazardous materials onto real property owned, operated, and/or maintained by the County and to avoid other conduct that causes harm to County property or facilities or the public health or environment.

52.     Defendants breached this duty by failing to operate the Smelter in a manner so as to prevent the release of hazardous substances onto real property owned, operated, and/or maintained by the County and by providing Smelter residues to the County for its use without fully explaining the nature of such materials and the harms they could cause to the County, and affecting roads, bar ditches, culverts, bridges, and other structures owned, operated, and/or maintained by the County.

53.     Each Defendant knew or should have known, and could reasonably foresee, that its activities would result in the contamination of the soil and other resources in and around the County to the detriment of Plaintiff.

54.     As a result, Defendants have breached the standard of reasonable care owed to the County, and as a direct and proximate result of Defendants' negligence, the County has been injured and damaged.

55.    As a result of Defendants' negligent acts and omissions, the County is entitled to recover from Defendants all of the damages proximately caused thereby.

### Fifth Cause of Action
### UNJUST ENRICHMENT

56.    The County restates, alleges, and incorporates Paragraphs 1 – 55 the same as if fully set forth herein.

57.    Defendants historically sold and/or provided at no cost Smelter residues to the County for use as road base or fill material and in other County operations in lieu of proper treatment or disposal of such waste residues. The County's past and future labor and expense to dispose of such materials, or to use such materials in lieu of disposal, has conferred and will continue to confer substantial economic benefits on Defendants.  Plaintiffs have incurred the cost of handling, treating, transporting, and/or disposing of metals and other Smelter waste, which Defendants by law and equity should bear.

58.    But for the County's acceptance and use of solid waste materials from the Smelter, Defendants would have incurred substantial additional costs to properly investigate, treat, transport, dispose, remediate, and/or remove such materials.  Defendants have therefore voluntarily accepted and retained the benefits conferred upon them by the County, and will be unjustly enriched if allowed to retain such benefits without compensating the County for such expenses.

59.    No remedy at law can adequately compensate the County for the damages occasioned by the conscious choice of Defendants to release and maintain hazardous materials on properties owned, operated, and/or maintained by the County and to sell or provide at no cost contaminated materials from the Smelter site in order to avoid the expenses of properly preventing the release, investigation, removal, transportation, and disposal of such materials, and

fully treating or repairing such property. Additionally, because most of the Smelter residues have been buried and covered, it will be, in many instances, impracticable or infeasible to remove them from properties owned, operated, and/or maintained by the County, thus preventing the County from having the nuisance fully abated.

60.     In addition, rather than committing the funds necessary to remedy their pollution and contamination decades ago, Defendants completely ignored the problems faced by the County and failed to provide any solution for the pollution and contamination within the County. As such, Defendants have retained and earned profit on the money they refused to expend, and the County is entitled to Defendants' rate of return on the money that should have been spent long ago.

61.     The County is therefore entitled to recovery from Defendants for the value of the benefits which have been and will continue to be conferred upon them by the County, the costs saved by Defendants by avoiding the responsibility to properly investigate, remove, treat, transport, and/or dispose of metals and other Smelter residues, and/or the disgorgement of all profits or returns Defendants have derived from their wrongful conduct.

## CLAIM FOR PUNITIVE DAMAGES

62.     The conduct of Defendants, as alleged above, was committed intentionally, with reckless, wanton and malicious disregard for the rights of the County and the public.

63.     Based on the seriousness of the hazard to the public, the profits derived by Defendants by disregarding the County's rights, the duration of Defendants' wrongful conduct, Defendants' awareness of the consequences of their acts or omissions, and their financial conditions, the County is entitled to recover from Defendants the maximum amount of punitive damages allowed by applicable law.

**DEMAND FOR JURY**

64.     The County requests a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, the County prays for judgment in its favor against Defendant for:

a.  Actual, consequential, and compensatory damages as awarded by the jury in an amount in excess of $75,000.00;

b.  Exemplary and punitive damages in an amount in excess of $75,000.00, as contemplated by applicable statute;

c.  Abatement of, and/or costs to abate, the public nuisance;

d.  Prejudgment and post-judgment interest as allowed by law;

e.  Costs of suit;

f.  Attorneys' fees allowed by statute for actions seeking recovery for the damage to property and as allowed by any other legal entitlement; and

g.  All other relief the Court deems appropriate.

**ATTORNEYS' LIEN CLAIMED**

23

Respectfully submitted,

Patrick M. Ryan (OBA No. 7864)
Donald K. Shandy (OBA No. 11511)
Phillip G. Whaley (OBA No. 13371)
Stephen C. Gelnar (OBA No. 18381)
Patrick R. Pearce, Jr. (OBA No. 18802)
**RYAN WHALEY COLDIRON SHANDY PLLC**
900 Robinson Renaissance
119 North Robinson
Oklahoma City, Oklahoma 73102
Ph:  (405) 239-6040
Fax: (405) 239-6766
Email: dshandy@ryanwhaley.com

- and -

James L. Menzer (OBA No. 12466)
**MENZER LAW OFFICES, P.C.**
211 West Blackwell Avenue
P.O. Box 818
Blackwell, OK 74631-0818
Ph:  (580) 363-0800
Fax: (580) 363-0801
Email: James.Menzer@MenzerLaw.com

**ATTORNEYS FOR PLAINTIFF**