**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF KAY, OKLAHOMA | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. CIV-12-00601-C |
| FREEPORT-MCMORAN COPPER & GOLD INC.; FREEPORT-MCMORAN CORPORATION f/k/a PHELPS DODGE CORPORATION; CYPRUS AMAX MINERALS COMPANY; and BLACKWELL ZINC COMPANY, INC., | ) ) ) ) ) ) ) | October 2013 Trial Docket |
| Defendants. | ) | |

## FINAL PRETRIAL REPORT

All counsel who will appear at trial:

Appearing for Plaintiff Board of Commissioners of the County of Kay, Oklahoma ("Plaintiff" or the "County"):

Patrick M. Ryan
Donald K. Shandy
Phillip G. Whaley
Stephen C. Gelnar
Patrick R. Pearce, Jr.
RYAN WHALEY COLDIRON SHANDY PLLC
900 Robinson Renaissance
119 North Robinson
Oklahoma City, Oklahoma 73102

James L. Menzer
MENZER LAW OFFICES, P.C.
211 West Blackwell Avenue
P.O. Box 818
Blackwell, Oklahoma 74631-0818

Dan Cavett
CAVETT AND FULTON PC
6035 E. Grant Road
Tucson, Arizona 85712

Appearing for Defendants Blackwell Zinc Company, Inc. ("BZC"), Cyprus Amax Minerals Company ("Cyprus Amax"), Freeport-McMoRan Corporation ("FMC"), and Freeport-McMoRan Copper & Gold Inc. ("FCX"):

Reid E. Robison
Timothy J. Bomhoff
MCAFEE & TAFT A PROFESSIONAL CORPORATION
Two Leadership Square
211 North Robinson Avenue, Suite 1000
Oklahoma City, Oklahoma 73102-7103
(405) 235-9621

Morgan L. Copeland, Jr.
Robert M. Schick
Lewis C. Sutherland
Tracey R. Keegan
Stacy M. Neal
Taylor R. Pullins
VINSON & ELKINS L.L.P.
First City Tower, Suite 2500
1001 Fannin Street
Houston, Texas 77002-6760
(713) 758-2222

Sandra G. Rodriguez
VINSON & ELKINS L.L.P.
2801 Via Fortuna, Suite 100
Austin, Texas 78746
(512) 542-8400

Kevin A. Gaynor (*pro hac vice* application pending)
Benjamin S. Lippard
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037-1701

**Jury Trial Demanded [\*]  -  Non-Jury Trial [\*]**

**Jury Trial:** All parties agree that Plaintiff's claims for negligence and products liability should be tried to a jury.

**Non-Jury Trial:**   The Court has ordered that the parties' claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") will be determined by a non-jury trial [Doc. No. 156].

Defendants have filed a motion for bifurcation, seeking a separate bench trial, or alternatively, a separate jury trial, on Plaintiff's theory that Cyprus Amax, FMC, and FCX are liable for BZC's liability on a veil-piercing or alter ego theory [Doc. No. 169]. Plaintiff objects and has requested a jury trial on these issues [Doc. No. 181].   That motion remains pending.

## 1.   BRIEF PRELIMINARY STATEMENT

\*Plaintiff has drafted its portion of the Brief Preliminary Statement below in accordance with the Court's instruction in the Final Pretrial Report form available on the Court's website to "[s]tate briefly and in ordinary language the facts and positions of the parties."   Defendants have repeatedly attempted to re-draft Plaintiff's statement of its claims in the Brief Preliminary Statement in a fashion acceptable to Defendants.   For example, Defendants insist that their statement include contested and irrelevant issues relating to whether smelter materials pose a threat to human health or the environment (indeed, suggesting that they do not); whereas, their contention in this case should be that smelter materials do not cause any damage to Plaintiff's property.   As another example, Defendants would not agree to allow Plaintiff to include a contention in this products liability case that smelter material is a "product" or that it is "dangerous."   Plaintiff's Brief Preliminary Statement should reflect Plaintiff's description of its actual claims, and not Defendants' preferred description of Plaintiff's claims.

\*\*Defendants object to the Plaintiff's portion of the Brief Preliminary Statement, and attempted to, but were unable to, reach agreement with Plaintiff on agreed language. (Plaintiff has mischaracterized Defendants' efforts to reach agreement on this issue.) Defendants object to Plaintiff's portion on the grounds that the statement is a non-neutral, argumentative statement that includes statements on contested issues without sufficient language conditioning the statement as a contention by the Plaintiff—leaving the misimpression that the Court has adopted these positions. For example and without limitation, Plaintiff repeatedly refers to the smelter materials as a "product," and describes the smelter materials as having "very high concentrations of" metals that Plaintiff describes as "dangerous"—which are contested issues in the case.   Defendants

further object to the inclusion of the alter ego issue in the preliminary statement in the event the Court grants Defendants' motion for bifurcation of the alter ego issue.

Plaintiff, Board of County Commissioners of the County of Kay, Oklahoma (the "County") claims that Defendant, Blackwell Zinc Company, Inc. ("BZC"), is liable to the County because BZC provided the County with a product – "Smelter Material" – which includes broken retorts, broken condensers, connie sand, slag, residue, and refractory brick generated by BZC during its operation of a zinc smelter in Blackwell, Oklahoma (the "Smelter"). BZC provided Smelter Material for the County's use in the construction and maintenance of its roads, bridges, and culverts. The County claims that BZC knew or should have known that the Smelter Material product it provided to the County contained very high concentrations of arsenic, lead, and other dangerous metals. This product was provided to the County with no warnings as to the content or amount of these dangerous metals in the product. As such, the County claims the product was defective and unreasonably dangerous to the County and has caused damage to County property, including roads, bridges, and culverts (sometimes collectively referred to as the "County road system"). Further, the County claims that BZC was negligent in providing Smelter Material containing such dangerous metals to the County, when it knew the use to which this product would be put by the County, and failed to provide the County any warnings, instructions, restrictions, or other information regarding the dangers of the Smelter Material. The County has been ordered by the Oklahoma Department of Environmental Quality ("DEQ") to begin removing the Smelter Material from the County road system.

The County has also sued the parent and affiliated companies of Blackwell Zinc Company. These parents and affiliates are Freeport-McMoRan Copper & Gold, Inc. ("FCX"); Freeport-McMoRan Corporation, formerly known as Phelps Dodge Corporation ("FMC"); and Cyprus Amax Minerals Company ("Cyprus Amax"). The County claims these parent and affiliated corporations have so dominated and controlled BZC that they have become the alter egos of BZC. As such, the County contends FCX, FMC, and Cyprus Amax are liable for all the damages incurred by the County in product liability and negligence.[1]

Defendants deny all of Plaintiff's claims. During certain periods of the operating life of the Smelter, the County took Smelter Materials from the Blackwell Smelter because there were both useful in construction and maintenance of the County's roads and bridges and free to the County.

---

[1] The County has submitted this preliminary statement in this form only because the Court has sustained the Defendant's Motion for Partial Summary Judgment [Doc. No. 177] on the County's claims sounding in nuisance, nuisance *per se*, trespass, and unjust enrichment, and thus, the County has not included a description of these claims here.

The County has asserted claims for both products liability and negligence. Defendants deny that Smelter Materials taken by the County are a "product" as defined by Oklahoma law.  In addition, Defendants deny that Smelter Materials are either defective or dangerous.  The smelter materials, which have been on the Plaintiff's road and bridges for between 40 to 95 years, have not caused injury to Plaintiff's property and the Smelter Materials and are serving a useful purpose. Defendants further contend that, while certain Smelter Materials contain some amounts of arsenic, cadmium, and lead, the use of smelter materials in road construction and maintenance does not pose a risk to human health or the environment and thus the smelter materials were not unreasonably dangerous and no warnings, instructions, restrictions, or other information was required or necessary.  Moreover, Defendants deny that FCX, FMC, or Cyprus Amax have dominated or controlled BZC such that they are the alter egos of BZC.

This preliminary statement is only intended to provide you with a brief overview of the parties and their claims or defenses in this case.  You will be provided much greater detail regarding the various claims and defenses at issue during the course of the trial.


**2.**     <u>**JURISDICTION**</u>

Subject matter jurisdiction for this case is established pursuant to 28 U.S.C. § 1332.  This Court also has original subject matter jurisdiction over the CERCLA claims and counterclaims under 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b).

Venue is proper in the United States District Court for the Western District of Oklahoma because the location of the actions comprising this lawsuit occurred in Kay County, Oklahoma, within this judicial district.


**3.**     <u>**STIPULATED FACTS**</u>

1.     Blackwell, Oklahoma, is located within Kay County.

2.     The Blackwell Zinc Smelter (the "Blackwell Smelter" or "Smelter") operated from approximately 1916 to 1974, and ceased commercial operations in 1974.

3.     The Blackwell Smelter was located on approximately 160 acres near the intersection of 13th Street and State Highway 11 in Blackwell, Oklahoma.

4.     BZC was formed in 1922 and assumed ownership and operation of the Blackwell Smelter at that time.

5.     The Smelter was used to refine zinc, and for a portion of its operating life it was used to refine cadmium.

6.      The cadmium plant at the Smelter opened in or about 1957.

7.      The ore concentrates used to refine zinc and cadmium at the Smelter came from various sources and locations.

***      The Parties are working on additional stipulated facts and will attempt to reach agreement regarding reasonable factual stipulations in advance of trial.

## 4.    **LEGAL ISSUES**

Plaintiff:

1.      The County respectfully reserves and preserves all legal issues and positions contained in briefings related to the subject of the Court's prior orders regarding disputed legal issues, including Defendants' motion for partial summary judgment [Doc Nos. 103, 104, 133, and 177], the County's motion for leave to file an Amended Final Exhibit List [Doc Nos. 91 and 157], the County's motion for an extension of time to designate rebuttal experts [Doc Nos. 78 and 86], Defendants' motion for a determination of the law applicable to alter ego/veil piercing [Doc Nos. 101, 130, and 155]; Defendants' motion to strike the rebuttal expert report of Dr. Christopher Teaf [Doc Nos. 81, 108, and 159], and Defendants' motion to strike the supplemental expert report of Dr. George Flowers [Doc Nos. 116, 140, and 166].

2.      All issues raised by the County in any motion, response, or reply thereto pending as of the date this final Pretrial Order was submitted to the Court, including but not limited to the any motions *in Limine* [Doc. Nos. 170 and 173]; Defendants' request for bifurcation and to strike the County's jury demand regarding alter ego/veil piercing issues [Doc. Nos. 169 and 181]; and the County's motion to strike or limit the testimony of Defendants' witness, Michael Hughes [Doc. No. 143].

3.      The extent to which Defendants will be permitted to put on evidence at trial related to human health risks, risk assessments, toxicology, and present or future injury or risks of injury to persons, as the County asserts claims only for property damage in light of the Court's Order sustaining Defendants' Motions for Partial Summary Judgment on the County's claims sounding in nuisance, nuisance *per se*, trespass, and unjust enrichment [Supplemental Motion *in Limine*, Doc. No. 207].

4.      The extent to which Defendants will be permitted to put on evidence at trial related to ecological risks, risk assessments, and present or future injury or risks of injury to environmental organisms or the natural environment in general (as opposed to the County's property), as the County asserts claims only for property damage in light of the Court's Order sustaining Defendants' Motions for Partial Summary Judgment on the County's claims sounding in nuisance, nuisance *per se*, trespass, and unjust enrichment [Supplemental Motion *in Limine*, Doc. No. 207].

5.     The extent to which the Court will permit Defendants to put on evidence at trial purporting to show that the County has acted inconsistent with its belief that the Smelter Material is hazardous or poses a risk of injury to persons or environmental, as the County asserts claims only for property damage in light of the Court's Order sustaining Defendants' Motions for Partial Summary Judgment on the County's claims sounding in nuisance, nuisance *per se*, trespass, and unjust enrichment [Supplemental Motion *in Limine*, Doc. No. 207].

6.     Should the County obtain a verdict in its favor on its claims for negligence and/or product liability, the extent to which the Court will instruct the jury on punitive damages under 23 O.S. § 9.[2]

7.     Whether there is any evidence of comparative fault on the part of the County in receiving the Smelter Material and putting it to beneficial use in the County road system.

8.     The extent to which the County should be allocated a share of Defendant BZC' costs voluntarily incurred in compliance with the state Consent Agreement and Final Order under CERCLA (entered in response to the threat of litigation by the County), whether BZC is also liable for costs under CERCLA as a past owner, past operator, or arranger, and the equitable allocation of any past and future costs under CERCLA.

Defendants:

1.     All legal issues contained in Defendants' motions to exclude certain of Plaintiff's experts (Doc. ## 72, 73, 74), and in Defendants' Motion to Strike Rebuttal Report of Plaintiff's Expert Christopher Teaf (Doc. # 81).

2.     All legal issues contained in Defendants' Motion to Bifurcate Plaintiff's Alter Ego/Veil-Piercing Theory (Doc. # 169).

3.     All legal issues contained in Defendants' Motion in Limine (Doc. # 170), Plaintiff's Motion in Limine (Doc. # 173), and Plaintiff's Supplemental Motion in Limine (Doc. # 207).

4.     All legal issues contained in Plaintiff's Motion to Strike Michael Hughes (Doc. # 143).

5.     All legal issues contained in Defendants' Motion to Strike Plaintiff's Late-Disclosed Witnesses (Doc. # 99).

---

[2] As stated in the County's Trial Brief [Doc. No. 188], should the Court exclude evidence of personal injuries and risks of future injury to humans, the County would limit its request for punitive damages to Categories I and II.

6.     Whether the Oklahoma manufacturers' products liability doctrine is applicable to the type of transaction at issue in this case.

7.     Whether smelter materials are a "product" for purposes of Oklahoma manufacturers' products liability regime.

8.     Whether BZC is a proper products liability defendant under Oklahoma manufacturers' products liability regime.

9.     Whether BZC was required to provide a warning with regard to the smelter materials.

10.     Whether smelter materials are unreasonably dangerous.

11.     Whether Plaintiff has met its burden of proof regarding the elements of its products liability claim against BZC.

12.     Whether Plaintiff has sustained damage to its property caused by the alleged defect in the smelter materials.

13.     Whether BZC, Cyprus Amax, FMC, or FCX owed any duty to Plaintiff that could satisfy the duty element of a negligence claim under Oklahoma law.

14.     Whether Plaintiff has met its burden of proof regarding the elements of its negligence claim against BZC, Cyprus Amax, FMC, or FCX.

15.     Whether Plaintiff has sustained injury or damage to its property.

16.      Whether injury or damage to its property, if any, sustained by Plaintiff was caused by the alleged negligence of BZC, Cyprus Amax, FMC, or FCX.

17.     With regard to its contention that Amax, Inc.'s liabilities and obligations have been assumed by Cyprus Amax (First Amended Complaint at ¶ 4), whether Plaintiff has met its burdens (1) to prove that Amax, Inc. is liable to Plaintiff, and (2) to prove that Cyprus Amax assumed the liabilities and obligations of Amax, Inc. To the extent that Plaintiff is claiming any "assumption" or "successor" liability as to corporations once or more removed from Cyprus Amax, whether Plaintiff has met its burden to prove liability and assumption of liability for each company along the line of succession.

18.     Whether Plaintiff has met it burden of proof regarding liability on any of the claims it has asserted against BZC, Cyprus Amax, FMC, and FCX.

19.     Whether Plaintiff has met its burden of proof regarding the actual damages or punitive damages it claims.

20.     Whether, to the extent one or more Defendants are held liable to Plaintiff, such liability, if any, is several as among the Defendants, not joint and several.

21.     Whether any Defendant is entitled to a set-off and credit for amounts recovered by, paid to, or otherwise received by Plaintiff (including the benefits of any specific performance) from any Defendant, any settling Defendant, and any other permissible collateral sources.

22.     Whether Plaintiff is barred from asserting theories of liability not pleaded in its First Amended Complaint, including without limitation, any claim for liability or damages for "deceit" or based upon a theory of agency—both of which were raised by Plaintiff for the first time in its proposed jury instructions (Doc. # 189).

23.     Whether, under applicable New York veil-piercing/alter ego law, Cyprus Amax, FMC, or FCX exercised complete domination of BZC, and whether Cyprus Amax, FMC, or FCX exercised complete domination of BZC in respect to the transaction attacked.

24.     Whether, under applicable New York veil-piercing/alter ego law, Cyprus Amax, FMC, or FCX used such a complete domination of BZC to commit a fraud, unjust act, or other wrong against Plaintiff that resulted in Plaintiff's injury.

25.     Whether, under applicable New York veil-piercing/alter ego law, the alleged domination and fraud/unjust act must be roughly contemporaneous to the conduct allegedly causing the plaintiff's alleged injury.

26.     Whether, under applicable New York veil-piercing/alter ego law, the adequacy of capitalization is to be measured at the time of incorporation of the allegedly dominated entity.

27.     Whether, under applicable New York law, the equitable doctrine of veil-piercing/alter ego law should be applied to pierce BZC's corporate veil to hold Cyprus Amax, FMC, or FCX liable for BZC's liability.

28.     Whether Plaintiff's veil-piercing/alter ego theory against Cyprus Amax, FMC, or FCX should be tried in a separate trial from Plaintiff's negligence and products liability claims.

29.     Whether the Seventh Amendment of the United States Constitution does not provide Plaintiff with a right to a jury trial on its veil-piercing/alter ego theory, such that a separate trial on its veil-piercing/alter ego theory should be a bench trial to the Court, as opposed to a separate trial to a jury.

30.     Whether the County roads and bridges at issue in this case constitute a "facility" as defined in 42 U.S.C. § 9601(9).

31.     Whether the County is a liable "covered person" under one or more of the following provisions of CERCLA:   "owner and operator" of a facility (42 U.S.C. § 9607(a)(1)); "owner or operator" of a facility at the time hazardous substances were disposed of there (42 U.S.C. § 9607(a)(2)); an "arranger" for disposal of hazardous substances (42 U.S.C. § 9607(a)(3)); or a "transporter" of hazardous substances (42 U.S.C. § 9607(a)(4)).

32.     Whether a release or threatened release of a "hazardous substance" has occurred on County roads and bridges.

33.     Whether the release or threatened release of a "hazardous substance" has caused BZC to incur response costs.

34.     Whether any costs incurred by BZC were "necessary" costs of response.

35.     Whether BZC's response action was consistent with the National Contingency Plan ("NCP").

36.     What portion of BZC's recoverable response costs should be allocated to the County based on the Court's weighing of relevant equitable factors.

37.     Whether the County roads and bridges at issue in this case constitute a "facility" as defined in 42 U.S.C. § 9601(9).

38.     Whether BZC is a liable "covered person" under one or more of the following provisions of CERCLA:   "owner and operator" of a facility (42 U.S.C. § 9607(a)(1)); "owner or operator" of a facility at the time hazardous substances were disposed of there (42 U.S.C. § 9607(a)(2)); an "arranger" for disposal of hazardous substances (42 U.S.C. § 9607(a)(3)).

39.     Whether a release or threatened release of a "hazardous substance" has occurred on County roads and bridges.

40.     Whether the release or threatened release of a "hazardous substance" has caused the County to incur response costs.

41.     Whether any costs incurred by the County were "necessary" costs of response.

42.     Whether the County's response action was consistent with the NCP.

43.     What portion of the County's recoverable response costs should be allocated to BZC based on the Court's weighing of relevant equitable factors.

44. Defendants have not specifically included in this Final Pretrial Report legal issues relating to Plaintiff's claims dismissed by this Court's summary judgment order (Doc. # 177). Defendants, however, incorporate by reference all legal issues expressed in Defendants' Motion for Partial Summary Judgment and Brief in Support (Doc. ## 103 & 104), Reply in Support of Motion for Partial Summary Judgment (Doc. # 147), and Response to Plaintiff's Motion for Partial Summary Judgment (Doc. # 129).

## 5. <u>CONTENTIONS AND CLAIMS</u>

<u>Plaintiff</u>:

1. The County originally asserted claims sounding in nuisance, nuisance *per se*, trespass, unjust enrichment, negligence, and product liability. The Court has granted partial summary judgment on the County's claims sounding in nuisance, nuisance *per se*, trespass, and unjust enrichment [Doc. No. 177]. The County is including herein its contentions related to those claims in order to preserve them. Such contentions are identified by brackets and underlining.

2. In light of the Court's rulings on Defendant's motion for partial summary judgment on the County's claims sounding in nuisance, nuisance *per se*, trespass, and unjust enrichment, the County incorporates all contentions contained in its Amended Complaint [Doc. No. 41], Motion for Partial Summary Judgment, Response to Defendants' Motion for Partial Summary Judgment, Motion to Bifurcate, and Response to Defendants' Motion to Bifurcate. The County includes here all contentions potentially relevant to any claim asserted by the County in this action, and preserves, and does not waive, any objection to the Court's prior rulings. Further, these contentions are submitted subject to the County's positions on Motions *in Limine* currently pending or which may be submitted to the Court, and Plaintiff's inclusion of such contentions here does not waive its positions as reflected in its briefing on such issues with the Court.

3. Generally, the County claims that property maintained by the County (the County road system) has been damaged and that the County has incurred, and will continue to incur, additional costs associated with the presence of Smelter Material in the County road system.

4. Plaintiff KAY COUNTY is a political subdivision of the State of Oklahoma represented in this action by its BOARD OF COUNTY COMMISSIONERS ("the Board"), which is the appropriate entity to take any legal action on behalf of the County pursuant to 19 O.S. § 4.

5. Defendant CYPRUS AMAX MINERALS COMPANY ("Cyprus Amax") is incorporated under the laws of the State of Delaware and has its principal place of business in the Arizona. Cyprus Amax was established through the merger of Cyprus

Minerals Company and Amax, Inc.  BZC was formerly a wholly-owned subsidiary of Amax, Inc., formerly known as American Metal Climax, Inc., formerly known as The American Metal Company, and became a wholly-owned subsidiary of Cyprus Amax as a result of the merger.  Amax, Inc. no longer exists as an entity as a result of the merger, and its liabilities and obligations have been assumed by Cyprus Amax.  Cyprus Amax is a wholly-owned subsidiary of FMC.

6.     Defendant FREEPORT-MCMORAN CORPORATION, formerly known as PHELPS DODGE CORPORATION ("FMC"), is incorporated under the laws of the State of New York and has its principal place of business in Arizona.  FMC is a wholly-owned subsidiary of FCX.

7.     Defendant FREEPORT-MCMORAN COPPER & GOLD INC. ("FCX") is incorporated under the laws of the State of Delaware and has its principal place of business in Arizona.

8.     Cyprus Amax, FMC, and FCX have each individually or collectively performed, caused to be performed, funded, guaranteed, and/or otherwise accepted responsibility for all obligations of BZC related to the Smelter and related cleanup actions under the direction and supervision of the Oklahoma Department of Environmental Quality ("DEQ") and the U.S. Environmental Protection Agency ("EPA").  These companies have, through their actions, conduct, and representations to the State of Oklahoma, DEQ, the City of Blackwell, and the Blackwell community, accepted responsibility for all cleanup, remediation, and damages associated with the historical operations of the Smelter.

9.     The County claims these parent and affiliated corporations of BZC (Cyprus Amax, FMC, and FCX) have so dominated and controlled BZC that they have become the alter egos of BZC.  The County further claims that by stripping the assets of BZC to make it a judgment-proof shell and selectively acting on behalf of BZC and/or funding its obligations for the cleanup related to the Smelter and representing to others, including the County, that these companies would take responsibility for such actions, Cyprus Amax, FMC, and FCX have used their domination and control of BZC to perpetrate a fraud, wrong, or injustice against the County.  As such, the County contends Cyprus Amax, FMC, and FCX are liable for all the damages incurred by the County in product liability and negligence.

10.     Kay County is located in north-central Oklahoma.  The County covers approximately 919 square miles and, as of July 2009, has a population of roughly 46,110.  The Board has exclusive authority to designate, construct, maintain, and repair all county roads under 69 Okla. Stat. § 601.  The Board has considerable discretion in the exercise of its jurisdictional powers over county roads.  All section lines opened and maintained by the Board are "public roads."  Most of the section line roads in Kay County have been opened and maintained by the Board since statehood.  Unless specifically stated to the

contrary, the County is responsible for maintaining a 66-foot right-of-way on all county roads (33 feet on either side from the center of the road). The County currently maintains roughly 1,463 miles of county roads.

11.     The Board also has exclusive jurisdiction over the construction, maintenance, and repair of bridges located on and/or connecting county roads. The County currently maintains approximately 426 bridges, approximately 288 of which are in excess of 20 feet long and, therefore, subject to regulation by the Oklahoma Department of Transportation.

12.     The County is divided into three (3) commission districts for purposes of assigning responsibility for maintaining and repairing county roads and bridges. Blackwell is located in Kay County District No. 3, which is the largest of the three districts and comprises the western portion of the County. District 3 maintains roughly 647 miles of roads and 116 regulated bridges. District 3 is where the majority of the Smelter Material is located in Kay County.

13.     Beginning in 1916, The American Metals Company (Limited) ("AMC") owned and operated the Smelter in Blackwell, Oklahoma, through its wholly-owned subsidiary, Bartlesville Zinc Company.

14.     On November 4, 1922, AMC created BZC, through which it owned, controlled, and operated the Smelter; AMC owned 100% of the issued and outstanding capital stock of BZC.

15.     The Smelter was a horizontal retort zinc smelting plant, which extracted zinc, cadmium, and other metals from ore concentrates from various sources and locations, producing millions of tons of zinc and cadmium products.

16.     From 1916 to 1974, the Smelter operated on approximately 160 acres in the northwest portion of Blackwell, Oklahoma, located in Kay County.

17.     In December 1957, AMC merged with Climax Molybdenum Company to form American Metal Climax, Inc., also known as AMAX.

18.     In 1971, AMAX contributed all the capital shares of BZC to a wholly-owned subsidiary, Amax Lead & Zinc, Inc., which then owned, controlled, and dominated BZC and contracted and acted as the sole sales agent for BZC.

19.     Faced with the prospect of expending significant amounts of money to comply with environmental regulations, in 1972, BZC and AMAX began the process of closing the Smelter. By 1974, BZC had completely dismantled the Smelter and closed the facility.

20.     In 1974, the Smelter was closed, and BZC deeded the property to the Blackwell Industrial Authority ("BIA") for redevelopment for industrial use.

21.     In May 1993, AMAX merged with Cyprus Minerals Company to form Cyprus Amax.

22.     In September 1999, Cyprus Amax and Phelps Dodge Corporation ("Phelps Dodge") merged, with Cyprus Amax surviving as a wholly-owned subsidiary of Phelps Dodge.

23.     In March 2007, Phelps Dodge and FCX merged, with FMC, formerly Phelps Dodge, surviving as a wholly-owned subsidiary of FCX.

24.     Since 1992, BZC, as well as CAMC, FMC, and FCX, individually and on behalf of BZC, have been actively performing and participating in an environmental cleanup of pollution, including waste material, from the Smelter.

25.     Extensive environmental investigations and remedial actions involving the Smelter property and surrounding Site began in the early 1990s.  In 1992, the U.S. Environmental Protection Agency ("EPA") conducted a soil sampling survey in Blackwell.  Based upon its investigation, EPA suggested that the Smelter property and surrounding areas affected by contamination from the Smelter could become a Superfund site and be placed on the National Priorities List ("NPL").  In order to avoid any action by EPA at that time, in 1992, BZC entered a Consent Agreement and Final Order with the Oklahoma Department of Health (the predecessor to DEQ) and committed to investigate and remediate the Smelter property as well as the surrounding area within the City of Blackwell.

26.     In April 1996, DEQ issued a Record of Decision Document, Soil Remediation Unit (the "Soil ROD"), which required Defendants to remediate soils to mandated cleanup levels for lead, cadmium, and arsenic.  DEQ determined that a significant portion of the Site was contaminated through historical aerial deposition of metals from the smelting operations and transport of solid waste materials and residues from the Site.  In the Soil ROD, DEQ identified a number of historical sources of metals at the Smelter, including various solid waste materials, such as retort and sinter residues, slag, crushed retorts, and condenser sands.  The Soil ROD recognized the potential harm associated with Smelter waste that had been transported to and placed in areas beyond the Smelter property:

> As the Remedial Design and Remedial Action progress, areas where smelter residues were transported and remain exposed or have insufficient cover will be identified.  Specific steps to be taken to identify smelter residues that remain exposed or have insufficient cover shall be included in the Remedial Design for the Soil Remediation Unit.  Such steps shall include solicitation of information

from the public.  Any areas that are identified as containing smelter residues shall be evaluated to determine whether they continue to pose a significant hazard.  If such areas are identified, then they shall be addressed as part of the Soil Remediation Unit in a manner that will eliminate or reduce the potential for exposure to an acceptable level.

Soil ROD, at 22.  DEQ indicated it was "not going to worry about" Smelter residues found beneath any asphalt or cement cap, such as beneath a paved street or road.  *Id.*, at 32 (Responsiveness Summary).  However, as previously determined by DEQ, Smelter Material that has been transported beyond the Smelter property and remains exposed to the environment creates a significant hazard to the County road system and to [public health and] the environment.

27.     Following entry of the CAFO, Cyprus Amax – on behalf of BZC – conducted an environmental investigation in Blackwell in the area on and surrounding the Smelter property under the supervision of DEQ.

28.     As part of the cleanup and actions required pursuant to the Soil ROD, Defendants addressed and removed visible smelter waste without sampling at properties within Blackwell.  Since 2009, Defendants have agreed to investigate and remediate Visible Smelter Material in Blackwell and Collinsville, Oklahoma, including the removal and/or capping of Smelter Material from residential, commercial, and public properties in Blackwell (2009), as well as along certain surface water tributaries within Blackwell (2011).

29.     The presence of Smelter Material in and on County roads creates an even greater concern to [human health and] the environment because of the significant likelihood that the waste material will become crushed or ground up by vehicle traffic and potentially become airborne.  This concern for the County has intensified in the last several years as significant oil and gas development and other energy projects have begun within the County, substantially increasing the amount and frequency of heavy truck traffic.

30.     DEQ policy requires that waste material must be removed, treated, or mitigated, and a human health risk-based approach to waste material is not appropriate.

Please note that screening levels or cleanup levels apply to contaminated media such as soil or water. If an obvious waste or waste source is found, or is known to exist from historical records, this source and waste material should be removed, treated, or mitigated.

DEQ, "Risk-Based Decision Making for Site Cleanup" (July 2013), at 4.

31.     The common approach to smelter waste exposed in the environment, where access cannot be restricted, is to require it to be removed and transported to an area where it can be consolidated, covered, and capped.  Defendants were aware of this common approach taken by Oklahoma, other states, and EPA.

32.     From the time the Smelter commenced operations, BZC and AMC knew and understood that zinc ore concentrates processed at the Smelter contained metals such as arsenic, lead, cadmium, and zinc.

33.     BZC's operation of the Smelter caused pollutants to be deposited on, beyond, and beneath the Smelter property.  Large piles of slag and other waste materials were regularly left exposed to the environment.  Air emissions from the Smelter's operations, in the form of both source and fugitive emissions, came to be deposited throughout the County, particularly in and around Blackwell.  Elevated levels of heavy metals (often substantially elevated), in particular zinc, cadmium, arsenic, and lead, from the Smelter are present in soils throughout the County.

34.     As part of its operations, the Smelter generated significant amounts of waste and byproduct material (e.g., broken retorts, slag, residues, condensers, connie sand, refractory bricks, and other similar material) that had little or no value and were considered waste by the Smelter (the "Smelter Material"). These materials were inherently waste-like, and the Smelter treated them as waste.

35.     If Smelter Material had any remaining value to the Smelter, it was sent to third parties for recycling or reprocessing.

36.     After any useful materials had been reclaimed and any beneficial materials were removed or sent away for reprocessing or recycling, the used Smelter Material was stored in large piles on the Smelter site awaiting disposal.   BZC maintained a staging and storage area for these waste materials in the northeast corner of the site (along 13th Street and Doolin Avenue).

37.     BZC provided Smelter Material at no charge to the County and other individuals and municipalities for use as fill material, top dressing, and other uses in road, bridge, and culvert construction and maintenance projects.  BZC employees would often take Smelter Material for their own private use as well.  The County was a primary recipient of the Smelter Material.

38.     BZC offered Smelter Material for road construction purposes, represented the suitability of Smelter Material as fill, and/or encouraged third parties to take and use Smelter Material.

39.     BZC at times used Smelter employees and equipment to load Smelter Material directly into County trucks and farmers' trucks for use in the County road system.

40.     BZC did not charge the County or any other third party for the use of BZC's personnel or equipment or for the Smelter waste itself.

41.     Neither BZC, AMC, nor any of their affiliated companies ever provided the County with any warnings of any kind in connection with the Smelter Material they provided for use in the construction and maintenance of the County road system.

42.     BZC never told the County about the quantities of arsenic, lead, and cadmium content in the Smelter Material, or even of their presence in the Smelter Material.

43.     If the County had not been able to use this Smelter Material in its road construction and maintenance activities, BZC would have been forced to properly dispose of this waste material.

44.     When the Smelter shut down in 1974, BZC was required to bury the remaining Smelter Material that was onsite and had not been sent for secondary recovery or given away to the County or others.

45.     Once the buildings at the Smelter were leveled on the site, BZC was required to place two feet of clean material on top of the remaining Smelter waste to prevent exposure to humans and/or the environment and place geotextile liners below the two feet of clean material.

46.     Broken retorts, residue, and other material provided to the County and others are presently visible in many locations on the County roads and rights-of-way; additionally, significant quantities of Smelter Material are present in the subsurface of County roads and around bridges and culverts.  Smelter Material was used in a significant portion of the County's roads, culverts, and bridges and is pervasive, particularly in the western half of the County (*i.e.*, District 3).  Very few of the County's roads (particularly in District 3) are paved or covered with an asphalt or cement cap, or ever have been, and despite the County's best efforts and expenses incurred to maintain an adequate cover of aggregate or other materials on its roadways, Smelter Material remains exposed and/or insufficiently covered even though the Smelter shut down nearly 40 years ago.

47.     Visible Smelter Material and soil contaminated with elevated levels of lead, cadmium, arsenic, and zinc, all as a result of Smelter operations, have been identified on properties owned, operated, and/or maintained by the County.  The County regularly encounters Smelter residues in repairing and maintaining its roads and bridges.  County workers who conduct maintenance and other routine activities on County roads and other

properties are constantly exposed to Smelter residues [, contaminated soils, and other potentially hazardous materials, which may require them to be specially trained and, depending on the circumstances, to wear protective clothing to perform their work].  In particular, grader operators continuously encounter additional Smelter residues brought to the surface as part of their routine maintenance on the roads.  The County is, has been, and will continue to be, subjected to significantly inflated costs associated with operations and maintenance because of the contamination.  The County also has incurred, and will continue to incur, increased costs for public works projects, such as due to hazardous materials handling requirements imposed on its contractors as well as additional training for its inspectors.

48.     County employees have reported visually identifying the presence of Smelter residues in hundreds of locations as part of their normal operations since January 1, 2012, particularly in District 3.  In addition to these visible confirmations, current and former County employees have identified numerous other areas where Smelter residues were used but are not currently visible at the surface.  The extent and pervasiveness of Smelter residues within Kay County, as well as the size of the County's road system and the County itself, make it impractical to identify all the locations where Smelter residues are present.  However, County workers estimate that 90% of the roads and nearly all the bridges in District 3 are impacted by Smelter Materials.

49.     BZC and AMAX knew that the Smelter Material given away to the County contained concentrations of arsenic, lead, cadmium, and zinc.

50.     Despite being highly sophisticated companies, who maintained a laboratory at the Smelter run by a chief chemist and an assistant chemist and laboratory facilities at AMAX employing 40-65 scientists responsible for evaluating the metal content of ore, product produced, and material that could be reused, reprocessed, or recycled, or alternatively, discarded or otherwise disposed of as waste, neither BZC nor AMAX ever did any test, study, or analysis to determine whether Smelter Material of the type given to the County could break down in the environment.

51.     There is no evidence that the County was aware that the Smelter waste contained arsenic, lead, or cadmium.

52.     Smelter Material was historically used as road base, to build and stabilize roads, for backfill around culverts and bridges, and to fill voids, and is present in a significant portion of the roads and around most of the bridges in Kay County District 3, either at the surface or buried beneath the surface.

53.     These were proper and appropriate uses of this type of material.  But for the fact that the Smelter Material contained hazardous substances, the County's use of this material would not have contributed to any contamination at the Site.

54.     There is no evidence that the County has generated any of the hazardous substances that have come to be located at the Site.

55.     The County's only contribution to contamination at the Site was through the use of Smelter Material for the purpose it was intended.

56.     Smelter Material is unstable and breaks down in the environment, either by way of natural weathering or crushing due to vehicle traffic and road grading.

57.     Smelter Material generated by BZC continues to leach hazardous substances in the County road system.

58.     Arsenic, lead, cadmium, and zinc associated with the Smelter Material are found in nearby soils, sediments, surface water, and road dust.

59.     Prior to November 2011, when the County approached Defendants regarding its concerns over Smelter waste in the County road system and threatened litigation, Defendants had not conducted any investigation to evaluate any risks associated with Smelter Material in the County road system, even though Defendants had actual knowledge of its existence in the County road system.  In fact, Defendants had knowingly, willfully, and arbitrarily drawn a line one mile beyond the Blackwell city limits and refused to remove (or fund the removal of) Visible Smelter Material in the County.  It is the County's belief that Defendants were preparing to walk away from the Site in 2012 after resolving certain litigation involving Blackwell residents and ignore the Smelter Material in the County, but for the County's threat of litigation.

60.     In April 2012, Defendants unilaterally approached EPA regarding an assessment of the County road system.  Defendants' proposal to conduct an investigation and assessment of the County road system was in direct response to the County's threat of litigation.

61.     On October 17, 2012, a Consent Agreement and Final Order ("CAFO") was entered among BZC, the County, and DEQ.

62.     Pursuant to the CAFO, DEQ required BZC to conduct a site investigation, and DEQ required the County to begin picking up Visible Smelter Material in the County road system, subject to the County's available resources, because of the County's exclusive jurisdiction over its road system and rights-of-way.

63.     The County has begun to pick up Visible Smelter Material at the Site.

64.     [The wrongful conduct of Defendants as described herein constitutes a continuing violation in tort including nuisance and trespass.] The County has been damaged and is continuing to be damaged by the wrongful acts of Defendants.

65. [The pollution and contamination of groundwater, surface water, land, soils, and other resources within the County constitutes a nuisance. This nuisance affects the health, safety, and welfare of a significant portion of the County, including the entire community of Blackwell. Pollution of the waters of the State of Oklahoma, including groundwater, is against the public policy of Oklahoma, pursuant to 82 Okla. Stat. § 1084.1., and causing pollution of the air, land, or waters of the State, constitutes a public nuisance *per se*, pursuant to 27A Okla. Stat. § 2-6-105. The wrongful conduct of Defendants as described herein constitutes a public nuisance. Additionally, the public nuisance created by Defendants is ongoing and continuous to this day. Pursuant to 50 Okla. Stat. § 7, no lapse of time can legalize such a public nuisance because the nuisance amounts to an actual obstruction of a public right.]

66. [Accordingly, the County brings this action for legal damages that would fully compensate it for all costs associated with Defendants' continued nuisance and trespass related to properties owned, operated, and/or maintained by the County as well as seeking abatement of such nuisance and the assessment of the costs of abating the public nuisance in the County against Defendants.]

67. [Defendants have intentionally and/or negligently acted or failed to act so as to cause the release of hazardous substances from the Smelter property into the community as a whole, including property owned, operated, and/or maintained by the County. Such conduct affects at the same time a significant portion of the County, including the entire community of Blackwell, and constitutes a public nuisance under 50 Okla. Stat. § 2.]

68. [By statute, Defendants' pollution of the waters of the State of Oklahoma, including groundwater, is against the public policy of Oklahoma, pursuant to 82 Okla. Stat. § 1084.1. Additionally, placing or causing any wastes to be placed in a location where they are likely to cause pollution of any air, land, or waters of the State constitutes a public nuisance *per se*, pursuant to 27A Okla. Stat. § 2-6-105. DEQ has previously declared contaminated soils associated with Defendants' actions to constitute a public nuisance.]

69. [The County has the authority to pursue this action for abatement of the public nuisance and/or assessment of all costs associated therewith against Defendants jointly and severally.]

70. [Defendants have intentionally and/or negligently acted or failed to act so as to cause the release of hazardous substances from the Smelter property which has unreasonably interfered with the County's use of real property and facilities including, but not limited to, roads, bar ditches, culverts, bridges, and other structures, resulting in inconvenience, annoyance, and discomfort to the County, loss of use and value of property owned, operated, and/or maintained by the County, increased costs associated

with County operations and maintenance, loss of use of the County's resources, and other injuries.]

71.     [The County has incurred, and will continue to incur in the future, damages, costs, and expenses as a result of such private nuisance, for which the County is entitled to receive compensation and reimbursement from Defendants, jointly and severally.]

72.     [Defendants' wrongful conduct was committed intentionally and knowingly, whether or not Defendants intended or knew of the consequences of their acts at the time they were committed.  These intentional activities have resulted and continue to result in the release of hazardous substances that have caused and will continue to cause an actual physical invasion of and interference with the County's property interests, including real property owned, operated, and/or maintained by the County and facilities including, but not limited to, roads, bar ditches, culverts, bridges, and other structures. This actual and physical invasion of and interference with County property is ongoing and continues to this day.]

73.     Defendants' conduct [, including but not limited to air and fugitive emissions associated with Smelter operations,] has occurred and continues to occur without permission, authority, or consent from the County.  Further, to the extent the County has consented to allow solid waste from the Smelter to be placed in, on, or around roads, bar ditches, culverts, bridges, and other structures, the County was induced to provide such consent by Defendants, who knowingly withheld information concerning the nature of the invasion and/or the extent of the harm to be expected from it.  At the time Smelter Material was provided to the County for its use, Defendants were in exclusive possession of knowledge and/or information regarding the true extent of the harm associated with this material and knowingly induced the County to take the materials without charge, in lieu of requiring Defendants to properly treat or dispose of them.

74.     [The County has incurred, and will continue to incur in the future, damages, costs, and expenses as a result of such unauthorized trespass, for which the County is entitled to receive compensation and reimbursement from Defendants, jointly and severally.]

75.     At all times material to this Petition, Defendants had a duty to conduct their operations at the Smelter property, including any remedial efforts since the Smelter was closed, in such a manner as to prevent the release of hazardous materials onto real property owned, operated, and/or maintained by the County and to avoid other conduct that causes harm to County property or facilities or the [public health or] environment.

76.     Defendants breached this duty by failing to operate the Smelter in a manner so as to prevent the release of hazardous substances onto real property owned, operated, and/or maintained by the County and by providing Smelter residues to the County for its

use without fully explaining the nature of such materials and the harms they could cause to the County, and affecting roads, bar ditches, culverts, bridges, and other structures owned, operated, and/or maintained by the County.

77.     Each Defendant knew or should have known, and could reasonably foresee, that its activities would result in the contamination of the soil and other resources in and around the County to the detriment of Plaintiff.

78.     As a result, Defendants have breached the standard of reasonable care owed to the County, and as a direct and proximate result of Defendants' negligence, the County has been injured and damaged.

79.     [Defendants historically sold and/or provided at no cost Smelter Material to the County for use as road base or fill material and in other County operations in lieu of proper treatment or disposal of such waste residues. The County's past and future labor and expense to dispose of such materials, or to use such materials in lieu of disposal, has conferred and will continue to confer substantial economic benefits on Defendants. Plaintiffs have incurred the cost of handling, treating, transporting, and/or disposing of metals and other Smelter waste, which Defendants by law and equity should bear.]

80.     [But for the County's acceptance and use of solid waste materials from the Smelter, Defendants would have incurred substantial additional costs to properly investigate, treat, transport, dispose, remediate, and/or remove such materials. Defendants have therefore voluntarily accepted and retained the benefits conferred upon them by the County, and will be unjustly enriched if allowed to retain such benefits without compensating the County for such expenses.]

81.     [No remedy at law can adequately compensate the County for the damages occasioned by the conscious choice of Defendants to release and maintain hazardous materials on properties owned, operated, and/or maintained by the County and to sell or provide at no cost contaminated materials from the Smelter site in order to avoid the expenses of properly preventing the release, investigation, removal, transportation, and disposal of such materials, and fully treating or repairing such property. Additionally, because most of the Smelter Material has been buried and covered, it will be, in many instances, impracticable or infeasible to remove them from properties owned, operated, and/or maintained by the County, thus preventing the County from having the nuisance fully abated.]

82.     In addition, rather than committing the funds necessary to remedy their pollution and contamination decades ago, Defendants completely ignored the problems faced by the County and failed to provide any solution for the pollution and contamination within the County.  [As such, Defendants have retained and earned profit on the money they refused to expend, and the County is entitled to Defendants' rate of return on the money that should have been spent long ago.]

83.   [The County is therefore entitled to recovery from Defendants for the value of the benefits which have been and will continue to be conferred upon them by the County, the costs saved by Defendants by avoiding the responsibility to properly investigate, remove, treat, transport, and/or dispose of metals and other Smelter Material, and/or the disgorgement of all profits or returns Defendants have derived from their wrongful conduct.]

84.   The Smelter Material was a product of BZC's manufacturing operations. BZC claims that this used material produced or manufactured by the Smelter was a "useful material" or product and had "substantial value," and knowingly provided the Smelter Material to the County (and others) for use as construction fill and for other uses, such as for reuse as a road and bridge construction material, as a substitute for alternative sources of clean fill material.

85.   At the time the Smelter Material left BZC's possession and control, they contained zinc and quantities of other metals, such as lead, cadmium, and arsenic.

86.   Contamination with these metals, often at significant levels, rendered the Smelter Material unreasonably dangerous to the County, who ordinarily would use this material as a substitute for other appropriate clean fill products, such as dirt, sand, gravel, and aggregate, none of which contained any meaningful quantities of these metals.

87.   The County used these used materials in an appropriate manner consistent with its use of other clean fill products, in the construction and maintenance of its roads and to fill low-lying areas.

88.   The presence of the Smelter Material in the County's roads has caused the County injury, both in terms of costs it has incurred investigating and remediating them and costs it will continue to incur.  But for the use of BZC's used material in its road system, the County would not today be incurring such costs.

89.   At the time BZC provided the used Smelter Material to the County for beneficial reuse in the construction and maintenance of its roads, BZC knew or should have known that these materials were dangerous for the use in road construction due to their high metal content and the likelihood that they would be exposed at or near the surface, particularly in unpaved roads.  Further evidence of the dangerous nature of the Smelter Material is that BZC has been required by DEQ to bury any remaining materials on the Smelter site and cover them with a protective cap and Defendants have agreed to remove Smelter Material from other areas in Blackwell and Collinsville.

90.   As the knowledge of the high metal content of Smelter Material was uniquely in the possession of BZC, BZC had no reason to believe that the County would realize the dangers associated with the use of Smelter Material in road construction and maintenance activities.

91.     BZC never provided the County any warnings regarding the dangerous conditions associated with the high metal content of the Smelter Material or adequate instructions or restrictions as to how to use this Smelter Material in road construction and maintenance activities to minimize their dangers.

92.     BZC is strictly liable for any injuries or damages associated with providing Smelter Material for use by the County in its road construction and maintenance activities and further breached its duty to warn the County of the dangerous condition created by using Smelter Material as intended in road construction and maintenance activities.

93.     As a result of BZC's negligent actions, breach of duty, and failure to warn, the County is entitled to recover from Defendant BZC all of the damages proximately caused thereby.

94.     As a direct and proximate result of the wrongful acts and omissions by the Defendants, the County has suffered and will continue to suffer damages, costs, and expenses including, without limitation, the following:

   a.     Damages to real property owned, operated, and/or maintained by the County that has been ruined, rendered less valuable, or otherwise adversely affected as a result of contamination from the Smelter and Defendants' failure to fulfill their responsibilities to clean up and forever eliminate all impacts and effects of the contamination;

   b.     Damages the County has incurred or will incur for investigation, testing, and remediation of Smelter contamination on properties it owns, operates, and/or maintains, including but not limited to costs incurred hiring consultants, engineers, lawyers, etc., and to implement and manage work practice standards imposed, or to be imposed, on the County by DEQ because of Defendants' contamination;

   c.     Damages due to increased costs associated with facilities and other resources owned, operated, and/or maintained by the County, including but not limited to its roads, bar ditches, culverts, bridges, and other structures;

   d.     Additional costs associated with the presence of contaminated materials on property where the County conducts required operations and maintenance, including but not limited to the County's roads, bar ditches, culverts, bridges, and other structures;

     e.    [Damages suffered by the County in the form of the inconvenience, annoyance, and discomfort it has experienced for decades as a result of the wrongful actions of Defendants which harms and significantly interferes with the County's full use and enjoyment of its property, results in lost resources, and causes the County additional costs of maintenance and operation;]

     f.    [Costs incurred, or to be incurred, to abate the nuisance created and maintained by Defendants;]

     g.    [Equitable damages in the amount by which Defendants have been unjustly enriched at the expense of the County;] and

     h.    Punitive and/or exemplary damages.

95.    The County seeks all damages to compensate it for the injury to County-maintained property.  The Smelter Material has caused a temporary injury to real property that is reasonably abatable (*i.e.*, capable of being corrected by a reasonable expenditure of money within a reasonable period of time).  The well-established measure of damages for temporary injury to real property under Oklahoma law is the reasonable cost of repairing the damage and restoring the property to its former condition.

96.    The County has calculated compensatory damages for injury to its real property by determining the costs to the County of removing the Smelter Material and/or keeping the Smelter Material adequately covered and away from County property, including bridges and culverts.

97.    The County also seeks punitive damages pursuant to 23 O.S. § 9.1.  Because Defendants knew their conduct was causing the release of pollutants.  The County alleges that at trial will show that Defendants acted with reckless disregard of Plaintiff and/or intentionally or with malice, and the County is entitled to Category I and Category II punitive damages.

98.    The County seeks an award of attorney fees and costs, pursuant to 12 O.S. § 940, because Defendants have negligently and/or willfully injured the County's property.

99.    The County also asserts CERCLA claims sounding in cost recovery and contribution against BZC.  The County contends that it should not be required to fund BZC's voluntary assessment performed in response to the County's threat of litigation, the costs of which BZC seeks to recover from the County.  Further, as part of the Court's equitable allocation of past and future costs incurred at the Site, the County contends it should be allocated none, or at most a very small percentage, of such costs, given that

BZC generated all the hazardous substances that have caused either party to incur costs at the Site but gave the Smelter Material to the County in lieu of proper disposal, and BZC knew that the Smelter Material contained arsenic, lead, and cadmium, but did not warn the County.

100.    BZC formerly owned and operated the Smelter, which is a "facility," as that term is defined in 42 U.S.C. § 9601(9).

101.    The Kay County road system constitutes a facility or facilities, as defined in 42 U.S.C. § 9601(9).

102.    There were "releases" and "threatened releases" of hazardous substances into the environment from residue, slag, and other waste generated by BZC at the Smelter that have come to be located at the Site.

103.    These releases or threatened releases have caused the County to incur response costs at the Site.

104.    BZC was the owner or operator of the "facility" at the time of such release or disposal under 42 U.S.C. § 9607(a)(2).   BZC owned and operated the Smelter at times during which there was a "release" or "threatened release" of "hazardous substances," including arsenic, lead, cadmium, and zinc, as those terms are defined in 42 U.S.C. §§ 9601(14), (22).

105.    Additionally, BZC, by contract, agreement or otherwise, arranged for the transport or disposal of hazardous substances from the Smelter to the Site and is liable under 42 U.S.C. 9607(a)(3).  BZC provided Smelter Material – a waste or byproduct of its operation – to the County to be placed directly on the land.

106.    BZC owned or possessed waste material generated by the Smelter, including broken retorts, slag, connie sand, residues, and furnace brick.

107.    Smelter waste contains hazardous substances, including arsenic, lead, cadmium, and zinc.  Smelter waste exposed in the environment is not inert and will naturally break down, mechanically and chemically, and leach these hazardous substances into the environment.

108.    The County has incurred initial site assessment and investigative costs, as well as costs of removal, and will continue to incur necessary response costs not inconsistent with the National Contingency Plan ("NCP") to investigate the presence of Smelter waste in the County road system, remove Smelter waste from its road system, and manage such Smelter waste to prevent any additional impacts to the environment. Such costs are closely tied to the actual cleanup of Smelter wastes, which contain hazardous substances.

109.   Pursuant to CERCLA, 42 U.S.C. § 9607(a)(4)(A), BZC is jointly and severally liable to the County in any subsequent action or actions to recover past or future response costs at the Site.

110.   Because BZC is a PRP under CERCLA § 107(a)(1), the Court must consider whether it would be equitable to require the County to pay all of BZC's recoverable costs on its CERCLA § 107(a) claim.

111.   In deciding contribution claims, the district court "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

112.   BZC has not incurred any necessary costs of response. All costs incurred to date are substantially intertwined with BZC's defense of the related civil litigation, and no such costs have related to the actual cleanup of any hazardous substances at the Site.

113.   BZC's costs are fees for consultants and/or experts not tied to any actual effort to contain or cleanup an action or potential release of hazardous substances. BZC unilaterally approached EPA about a site investigation only after first being threatened with litigation by the County. BZC has made no effort to contain or remove Smelter waste. Indeed, BZC has stated to DEQ that no such action is necessary – a position they held from the first moment they were approached by the County regarding remediation of the County's road system.

114.   Costs incurred after a lawsuit is initiated cannot serve as the basis for a CERCLA action and are not recoverable as a matter of law. The only costs "incurred" by any Defendant prior to filing the Counterclaim were $28,000 invoiced by Arcadis to prepare a "scope of work." At the time of filing, no Defendant was under any obligation to do any work at the Site, as the DEQ CAFO was not entered until October 17, 2012. Those are the only costs potentially recoverable in this action by BZC.

115.   BZC's claims for recovery of "response costs" incurred to date, and for a declaratory judgment awarding it future response costs, are clearly premature and not proper under CERCLA.

116.   In considering all the equitable factors, the volume of waste and hazardous substances generated is the most important under these circumstances. All of the waste and hazardous substances present at the Site that caused the parties to incur response costs were generated by BZC. The County did not generate any hazardous substances found at the Site. Any Smelter waste that was not taken by the County has still required remedial action, either at the time the Smelter closed or through subsequent actions, including Smelter waste that was buried on site and covered and Smelter waste found within the City of Blackwell that has been removed and disposed of at the former Smelter property.

Defendants:

1.     The County voluntarily took smelter materials (retort slag/residue, retort condensers and condenser sand, broken used retort vessels, and refractory brick) from the Blackwell Smelter for use in constructing and maintaining County roads and bridges. The County used the smelter materials because they were useful and free.

2.     The County has not spent any money or incurred any costs because of the presence of these smelter materials.

3.     The County itself placed the smelter materials on its roads and bridges. Despite placing the smelter materials on its roads and bridges, and knowing of their presence for decades, the County never exhibited any concern regarding the smelter materials.  Prior to hiring counsel, the County never raised any questions or requested assistance from the Defendants or any regulatory agency.

4.     The County has never exhibited concern that smelter materials on its roads and bridges were a problem, and it still has not.  Even today, the County does not treat these smelter materials as if they were "hazardous."  For example, the County provided no written warnings to County road workers until five months after this lawsuit was filed, and when it did finally provide warnings to County workers, it did not require the use of any new protective equipment. In addition, the County's current maintenance and repair practices with respect to smelter materials demonstrate that the County is not treating smelter materials as if they are causing damage to roads and bridges or as if they are either "hazardous" or "dangerous." For example, and without limitation, the County's actual handling of smelter material on County roads has resulted in both (i) increased potential contact between the public and County workers with smelter materials and (ii) increased migration of smelter materials within the environment.  Specifically, at bridge rebuild locations, the County removed smelter material historically placed as subsurface fill, where it could not contact persons or the environment, and reused it as surface fill to rebuild stream banks and fill in road locations.  In doing so, the County did not utilize any mechanisms (such as silt fences) to minimize runoff of piles of smelter material and placed smelter material within the active stream channel where it would be dispersed within the environment. Also, County workers did not wear protective clothing when working around smelter materials at the bridge construction sites.  The County's actions are inconsistent with the contention that smelter materials have caused injury to roads and bridges as manifested by harm to human health and the environment or by the need for special handling to avoid damage to the environment.

5.     Despite placing these materials on the road knowing that the materials were a byproduct of the zinc smelter, the County made no inquiries or requests for sampling of roads despite environmental remediation activity occurring adjacent to the County's District 3 Barn.  Nor did it exhibit concern in the late 2000s while the Supplemental Soils Program was ongoing in the City of Blackwell.  In connection with that Program, certain

Commissioners were sent solicitations for sampling of properties they owned, and the County received a sampling solicitation, which was interpreted by a Commissioner as relating to certain County roads. But the Commissioner stated that there was no reason for the County roads to be tested.

6.     Prior to the filing of the County's lawsuit, Defendants proposed to conduct and fund an assessment of the County's roads and bridges under the oversight of the EPA and ODEQ. The County refused to wait for the outcome of the investigation. Instead, it filed a lawsuit. It did so knowing that a comprehensive investigation was about to begin.

7.     Smelter materials and other similar industrial by-products were viewed as useful road building materials prior to and during the 1960s and 1970s.  The County's use of smelter materials was designed to address specific needs such as erosion control and stabilization near water features.  As a result, the location of smelter materials on County roads and bridges is, contrary to the County's claims, neither random nor without explanation.  Rather, the materials were primarily used around water features, such as fill for erosion holes, to build up low-lying areas, and as fill in and around bridges, culverts, and drainage ditches.

8.     Additionally, there is sufficient information to identify the location of smelter materials present on County roads and bridges.  Smelter materials are located on only a small portion of County roads and are not, contrary to the County's claims, located on 90% of the County's roads or under the surface of the majority of the County's roads.

9.     The smelter materials have been on the County's roads and bridges for somewhere between 40 and 95 years. There have been no reports of injuries or disease due to exposure or contact with these materials, and there is no harm to the environment. The County claims that smelter materials pose a risk to human health and the environment. However, the analysis conducted by the County's experts is not representative of the conditions on the County's road and bridges or the likely exposure scenarios.

10.     BZC, the County, and the ODEQ are parties to a 2012 Consent Agreement and Final Order ("CAFO"). Pursuant to the CAFO and the associated work plan approved by the EPA and ODEQ, BZC conducted an assessment of the County's roads and bridges. The assessment included a comprehensive sampling effort on the County's roads and bridges by a team of environmental specialists.

11.     The County is a party to the CAFO and has participated in the assessment of the County's roads and bridges. The County reviewed and submitted comments to EPA and ODEQ on the scope of work, and participated in multiple conference calls and meetings with BZC, DEQ, and EPA about the assessment process.  The County had the opportunity to observe the sampling and collect split samples for independent analysis.

12.     Using the sampling data from the assessment, a human health risk assessment and ecological risk assessment were conducted consistent with risk assessment procedures approved by EPA and ODEQ.  These risk assessments concluded that the smelter materials on the County's roads and bridges do not present a risk to human health or the environment.

13.     The hard data generated by the comprehensive scientific assessment of the entire road system, undertaken by BZC under the supervision of the ODEQ and the EPA, proves that smelter materials on County roads and bridges pose no threat to human health or the environment.  Additionally, Defendants' experts have conducted separate and additional analyses that demonstrate that the smelter materials pose no threat to human health or the environment. As a result, no remedial action is necessary to protect human health and the environment in regard to the smelter material present on County roads and bridges.

14.     Plaintiff has sustained no injury or damage to its property as a result of the presence of smelter materials on County roads and bridges.

15.     BZC did not violate the standard of care by allowing the County to take smelter materials or by providing the smelter materials to the County without a warning. BZC (and the zinc industry in general) did not regard and would not have regarded the smelter materials provided to the County as harmful.  To the contrary, providing smelter materials to the public was a common practice in the smelting industry and was regarded as a means for creating and maintaining good community relationships.

16.     FCX, FMC, and Cyprus Amax never owned or operated or were involved in the operation or the Smelter.

17.     BZC is the only entity that owned or operated the Smelter from 1922 to 1974.

18.     Cyprus Amax acquired the stock of BZC long after BZC closed the Smelter. Likewise, FMC and FCX acquired the stock of BZC's parent, Cyprus Amax, long after the Smelter was closed.

19.     BZC began the process of closing the Smelter in or about 1972 and closed the facility by 1974. The shutdown was a result of a combination of factors, including energy shortages, plant productivity, new environmental protection requirements, and age of the facility.

20.     BZC is a wholly owned subsidiary of Cyprus Amax.

21.     Cyprus Amax is a wholly owned subsidiary of FMC.

22.     FMC is a wholly owned subsidiary of FCX.

23.     In April 1996, ODEQ issued a Record of Decision Document, Soil Remediation Unit ("Soil ROD"). The soil in certain areas of the former Blackwell Smelter site and the City of Blackwell contained levels of zinc, arsenic, lead, and/or cadmium above naturally occurring background levels.   The Soil ROD established cleanup levels for arsenic, lead and cadmium in soil.   The Soil ROD only required the removal of visible smelter material when it was located in an area that also exceeded one or more of these soil cleanup levels.   The Soil ROD did not address the presence of smelter material on rural County roads.

24.     In 2009, BZC voluntarily agreed as part of its Supplemental Soil Program to remove visible smelter materials, if any were observed, from certain residential properties within the city limits of the City of Blackwell and up to one mile outside the city upon the request by the property owner.   This voluntary action was to address perception issues and was not a result of any identified risk to human health or the environment or other damage to property.

25.     The County has a statutory duty to design, construct, maintain, and repair County roads, bridges, and adjacent rights of way.

26.     The County made the decision to place smelter materials taken from the Blackwell Smelter on Kay County roads and bridges.

27.     The County has allowed quantities of trash and other debris to pile up along County roads and has utilized other road construction materials, including used asphalt, boiler slag, bottom ash, fly ash, concrete, and other materials that potentially contain "hazardous" materials, without claiming any property damage and without even testing the extent to which those materials may be "hazardous."

28.     Remediation decisions address site-specific conditions and are based on individualized determinations of a remedial investigation, feasibility study, and circumstances leading to the selection of a remedy, and therefore there is no one "preferred solution" or "common approach" to remediation.

29.     BZC is not a proper products liability defendant under Oklahoma manufacturers' products liability regime because BZC is not a manufacturer or supplier within the meaning of Oklahoma manufacturers' products liability regime and because BZC was not "in the business of" manufacturing or supplying smelter materials for use in road and bridge construction or maintenance within the meaning of Oklahoma manufacturers' products liability regime.

30.     The smelter materials were not and are not defective.

31.    The smelter materials were not defective in light of the state of the art/practice and state of the knowledge, with regard to the use of smelter materials in road and bridge construction and maintenance.

32.    The defect in the smelter materials, if any, did not render the smelter materials unreasonably dangerous.

33.    The smelter materials did not contain arsenic, zinc, lead, or cadmium in sufficient quantities to render them unreasonably dangerous for use in road and bridge construction or maintenance.

34.    BZC did not know and did not have reason to know at the time the smelter materials left its control that the smelter materials were or were likely to be unreasonably dangerous.

35.    At no point prior to the time the smelter materials left BZC's control was there a sufficient body of knowledge concerning potential hazards to human health or the environment available to BZC that it should have been able to foresee the hazards, if any, of using  smelter materials for road construction and maintenance.

36.    BZC was not required to provide a warning to Plaintiff with regard to the smelter materials.

37.    Plaintiff has not met its burden of proof regarding the elements of its products liability claim against BZC.

38.    Plaintiff has not sustained any damage to its property caused by the alleged defect in the smelter materials.

39.    No defect, if any, in the smelter materials was a cause of injury to Plaintiff's property because there was an intervening cause that interrupted or broke the connection between any defect and Plaintiff's injury.

40.    The Oklahoma manufacturers' products liability doctrine is not applicable to the type of transaction at issue in this case.

41.    Smelter materials are not a "product" for purposes of Oklahoma manufacturers' products liability law.

42.    Neither BZC, Cyprus Amax, FMC, nor FCX owed any duty to Plaintiff that could satisfy the duty element of a negligence claim in Oklahoma.

43.    BZC had no duty to warn Plaintiff about the alleged harm the smelter materials could pose for use in road and bridge construction or maintenance.

44.     BZC had no duty to refrain from allowing Plaintiff to take smelter materials from the Smelter for use in road and bridge construction or maintenance.

45.     Cyprus Amax, FMC, and FCX never owned or operated the Smelter, were not involved in Plaintiff's taking of the smelter materials from the Smelter, and had no duty to warn Plaintiff about the alleged harm the smelter materials could pose for use in road and bridge construction or maintenance.

46.     BZC had no duty to remediate the County's property, including no duty to remediate the County's property by virtue of BZC's remediation actions in Blackwell, Oklahoma.

47.     Cyprus Amax, FMC, and FCX do not have liability for any alleged "continued failure to address smelter waste in Kay County." (Doc. #133 at 22).

48.     Cyprus Amax, FMC, and FCX had no duty to remediate the County's property and no such duty was imposed upon them by virtue of participation, if any, in remediation actions "on behalf of BZC" in Blackwell, Oklahoma.

49.     In determining whether BZC, Cyprus Amax, FMC, or FCX was negligent in failing to exercise ordinary care, ordinary care must be determined by the standard of a reasonably careful person at the time of the alleged negligence.

50.     BZC, Cyprus Amax, FMC, and FCX were not negligent and did not fail to exercise ordinary care to avoid injury to Plaintiff's property.

51.     BZC, Cyprus Amax, FMC, and FCX were not negligent and did not fail to exercise ordinary care in light of the state of the art/practice and state of the knowledge, with regard to the use of smelter materials in road and bridge construction and maintenance.

52.     At no point in time relevant to Plaintiff's negligence claim was there a sufficient body of knowledge concerning potential hazards to human health or the environment available to Defendants that they should have been able to foresee the hazards, if any, of using smelter materials for road construction and maintenance.

53.     Plaintiff has not sustained damage to its property caused by the alleged negligence of BZC, Cyprus Amax, FMC, or FCX.

54.     There was an intervening cause that interrupted or broke the connection between the act or omission of BZC, Cyprus Amax, FMC, or FCX, if any, and Plaintiff's injury.

55.     Plaintiff has not met its burden of proof regarding the elements of its negligence claim against BZC, Cyprus Amax, FMC, or FCX.

56.    Plaintiff has the burden to establish an existing, actual physical injury to its property.  *See, e.g., City of Witchita, Kansas v. U.S. Gypsum Co.*, 72 F.3d 1491, 1499 (10th Cir. 1996). Plaintiff's damages cannot be premised on the mere risk of potential future harm not yet suffered.  *Id.*

57.    The mere fact that some of the smelter materials present on County roads or bridges contain some quantity of a metal described as "hazardous" does not constitute an injury to property. *See, e.g., id.* at 1498.

58.    To demonstrate an injury to its property, Plaintiff must demonstrate that the smelter materials on County roads or bridges pose an unreasonable risk of harm to humans or to the environment.  *Id*. at 1499.

59.    Plaintiff has not sustained any damage to its property resulting from the presence of smelter materials on its property.

60.    Plaintiff has not sustained any damage to its property caused by any alleged act or omission on the part of BZC, Cyprus Amax, FMC, or FCX, or by any alleged defect in the smelter materials.

61.    In connection with its allegation that Amax, Inc.'s liabilities and obligations have been assumed by Cyprus Amax, Plaintiff must demonstrate that Cyprus Amax assumed the liabilities and obligations of Amax, Inc. To the extent that Plaintiff is claiming any "assumption" or "successor" liability as to corporations once or more removed from Cyprus Amax, Plaintiff must demonstrate assumption of liability for each company along the line of succession. Plaintiff has not met these burdens.

62.    In connection with its allegation that Amax, Inc.'s liabilities and obligations have been assumed by Cyprus Amax, Plaintiff must further demonstrate that Amax, Inc. is liable to Plaintiff.  To the extent that Plaintiff is claiming any "assumption" or "successor" liability as to corporations once or more removed from Cyprus Amax, Plaintiff must demonstrate that the company at issue along the line of succession is liable to Plaintiff. Plaintiff has not met these burdens.

63.    Plaintiff's claims are barred, in whole or in part, because at all relevant times Defendants acted in a manner consistent with then-existing and reasonably available technological, scientific, and industrial state-of-the-art, as well as all applicable governmental regulations, oversight, agreements and orders.

64.    Plaintiff's claims are barred, in whole or in part, because at all relevant times the materials used by Plaintiff were reasonably safe based upon the established state of knowledge that existed at the time the materials were obtained by Plaintiff.

65.    Plaintiff's alleged damages are barred, in whole or in part, by the County's own contributory negligence, fault, or failure to exercise ordinary care.

66.   Plaintiff's alleged damages are barred, in whole or in part, because of its failure to mitigate its alleged damages.

67.   Plaintiff's alleged damages were not caused by any failure to warn on the part of Defendants.

68.   Defendants are not jointly and severally liable for Plaintiff's alleged damages.

69.   Should any Defendant be held liable to Plaintiff, which liability is specifically denied, such Defendant would be entitled to a set-off and credit for amounts recovered by, paid to, or otherwise received by Plaintiff (including the benefits of any specific performance) from any Defendant, any settling Defendant, and any other permissible collateral sources.

70.   Plaintiff's claims are subject to the requirement of election of remedies.

71.   Plaintiff is not entitled to any award of punitive damages against any Defendant, pursuant to the standards set forth in OKLA. STAT. tit. 23, § 9.1.

72.   The imposition of punitive damages against any Defendant would contravene Defendants' rights under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution, as well as the Equal Protection Clause of the Fourteenth Amendment, the Excessive Fines Clause of the Eighth Amendment of the United States Constitution, the Double Jeopardy Clause in the Fifth Amendment to the Constitution of the United States, and the correlative provisions of the Oklahoma Constitution.

73.   To the extent that Plaintiff's claims for punitive damages seek recovery for punitive damages as punishment for conduct that occurred outside of the State of Oklahoma's borders, such an imposition of punitive damages would violate Defendants' rights under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution, as well as the correlative provisions of the Oklahoma Constitution. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003); *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 572−73 (1996).

74.   Plaintiff is barred from asserting theories of liability not pleaded in its First Amended Complaint, including without limitation, any claim for liability or damages for "deceit" or based upon a theory of agency—both of which were raised by Plaintiff for the first time in its proposed jury instructions (Doc. # 189).

75.   Plaintiff has conceded that it has no evidence that air and fugitive emissions associated with Smelter operations affected County roads and bridges, and Plaintiff has no such evidence.

76.     Plaintiff has conceded that Defendants are not liable for any pollution of waters of the state, and Plaintiff has no evidence of such liability.

77.     Plaintiff is not alleging any injury to County roads and bridges resulting from groundwater contamination, and Plaintiff has no evidence of any such injury.

78.     Plaintiff is not entitled to recovery of attorneys' fees under Oklahoma law.

79.     Defendants adopt all contentions contained in their Answer filed in response to Plaintiff's First Amended Complaint (Doc. # 44).

80.     Defendants' contentions on Plaintiff's veil-piercing/alter ego theory are set forth more fully in their Proposed Findings of Fact and Conclusions of Law (Doc. # 192), which is incorporated by reference herein.

81.     Under New York law, in order to pierce BZC's corporate veil to hold Cyprus Amax, FMC, or FCX liable for BZC's obligations, Plaintiff must prove that Cyprus Amax, FMC, or FCX exercised complete domination over BZC with respect to the transaction attacked and that such domination was used to commit a fraud, unjust act, or other wrong against Plaintiff which resulted in Plaintiff's injury. Plaintiff has failed to meet its burden with respect to either prong of this test.

82.     Under New York law, the alleged domination and fraud/unjust act/other wrong must be roughly contemporaneous to the conduct allegedly causing the plaintiff's alleged injury.

83.     Under New York law, the adequacy of capitalization is to be measured at the time of incorporation of the allegedly dominated corporation.

84.     With respect to the domination prong, courts consider several factors. Application of the factors to the facts of this case warrants a finding that Cyprus Amax, FMC, and FCX did not exercise complete domination over BZC, and did not do so with respect to the transaction attacked by Plaintiff.

85.     One of these factors is the observance of corporate formalities.  BZC has, since its inception and up to the present day, observed all appropriate corporate formalities.

86.     Another factor that courts consider in determining whether a corporation has been dominated is the adequacy of its capitalization.  BZC has been adequately capitalized at all times, including, but not limited to, its date of incorporation and the closure of the Smelter. BZC retained sufficient assets to fund all of the obligations it reasonably foresaw at the time.  Every creditor of BZC, trade or otherwise, has been paid in full by BZC.

87.     Another factor courts consider in determining whether a subsidiary has been dominated by its parent is whether funds were put in and taken out of the corporation for personal rather than corporate purposes.  There is no evidence that any funds were ever taken out of BZC for the personal purposes of any shareholder of BZC.

88.     Courts also consider whether there is overlap in ownership, officers, and directors between the parent and subsidiary entity.  During at least its operating years, BZC had a board that included non-overlapping directors and had non-overlapping officers.

89.     Courts consider whether there is common office space, address, and telephone numbers between the corporate entities as a factor in determining whether a corporation has been dominated.  BZC has never shared common office space at the Smelter with any affiliate or parent company, nor has it ever shared space, an address, or telephone numbers at that location.  As is common with corporate affiliates, BZC does share executive office space and an address with several other affiliates currently in Phoenix, Arizona and formerly in New York, New York.

90.     Another factor considered by courts in establishing whether a parent corporation dominated a subsidiary is whether the subsidiary exhibited independent business discretion.  The manager of the Smelter ran all plant operations and was responsible for scheduling, production, managing raw materials, hiring and firing employees, negotiating collective bargaining agreements, and other tasks.  Additionally, BZC's Board of Directors exhibited independence in decision-making and was active and engaged in running the business of BZC.

91.     Another factor considered by courts in establishing whether a subsidiary has been dominated is whether the related corporations dealt with the dominated corporation at arms-length.  BZC operated under arms-length agreements with affiliated companies during much of the period when the Smelter was in operation whereby BZC's product was sold to third parties, with the proceeds attributed to BZC.  BZC had numerous opportunities to renegotiate the terms of the agreements over the years and did so at arms-length.

92.     Courts also consider whether corporations are treated as independent profit centers in analyzing domination.  BZC was at all times an independent profit center and went to great lengths to capture all transactions with its parent and affiliates in its books and records so that profitability could be assessed.

93.     Another factor considered by courts is whether the parent entity pays or guarantees the debts of the allegedly dominated corporation.

        a.      During the period in which the Smelter was operating, BZC and other subsidiaries of AMC shared services in order to realize the benefits of scale,

and BZC recorded and tracked transactions with affiliated entities through intercompany accounting and the use of intercompany accounts. BZC used centralized services from its parent and accounted for those services through intercompany transactions. The shared functions used by BZC affiliates are not uncommon practices for independent, related companies. Although BZC utilized these common banking arrangements, BZC's and its parent and affiliates did not commingle the accounting of these funds.

    b.    Since 1999, BZC has paid all expenses for investigation and remediation activities associated with the former Blackwell Smelter and all payments to settle litigation relating to the former Smelter, through capital contributions from affiliates that were all properly accounted for.

94.    Finally, courts consider the extent to which property of the subsidiary was used by other related corporations as it were its own. No parent entity of BZC used BZC's property as its own.

95.    In order to pierce BZC's corporate veil to hold Cyprus Amax, FMC, or FCX liable for BZC's obligations, Plaintiff must further prove that Cyprus Amax, FMC, or FCX used its complete control of BZC to commit a fraud or an unjust act against Plaintiff that resulted in an injury to Plaintiff. There was no fraud, unjust act or other wrong by BZC stockholders in maintaining the corporate form of BZC. For example and without limitation, assets were not stripped or removed from BZC by its stockholders in order to work a fraud, unjust act or other wrong upon creditors of BZC. In fact, Plaintiff cannot identify a single creditor who has been harmed or even prejudiced by BZC's payment of dividends.

96.    Under New York law, veil-piercing/alter ego is an equitable remedy, to be determined pursuant to a court's discretion. *See* Doc. # 192.

97.    Under New York law, courts are reluctant to pierce the corporate veil to hold one corporation liable for another corporation's liability.

98.    The inability to satisfy a judgment, if any, is insufficient standing alone to warrant piercing the corporate veil of a corporation.

99.    BZC's contentions on the CERCLA claims are set forth more fully in its Proposed Findings of Fact and Conclusions of Law (Doc. # 191), which is incorporated by reference herein.

100.    The County roads and bridges constitute a CERCLA facility. 42 U.S.C. § 9601(9).

101.    The County is a political subdivision of the State of Oklahoma and is therefore a statutory "person."

102.   The County is liable under CERCLA for BZC's environmental response costs under 42 U.S.C. § 9607(a)(1)-(4) as a current owner and operator, owner or operator at the time of disposal, arranger, and transporter.

103.   Zinc, arsenic, cadmium, and lead fall within CERCLA's definition of "hazardous substances," and are contained in some smelter materials that are present on County roads as a result of the County's placement of these materials there, which suffices to establish a release or threatened release of "hazardous substances" under CERCLA.   42 U.S.C. § 9601(22); 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4; *United States v. Hardage*, 761 F. Supp. 1501, 1510 (W.D. Okla. 1990).

104.   BZC has expended $1,690,688.17, or a greater amount to be proven at trial, in recoverable "response costs" related to investigating the presence of "hazardous substances" in the Kay County road and bridge system.   *County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1512 n.7 (10th Cir. 1991).

105.   BZC's response costs relate to, *inter alia*, "site investigation, soil sampling, and risk assessment" incurred in connection with a government-overseen effort to respond to the presence of smelter materials containing "hazardous substances," making them "necessary" costs of response.   *Young v. United States*, 394 F.3d 858, 863-4 (10th Cir. 2005).

106.   BZC's response costs were "necessary" due to the existence of "some nexus between the alleged response cost and an actual effort to respond to environmental contamination." *Young*, 394 F.3d at 863-4.

107.   The response costs BZC seeks to recover in this case relate to work performed under the ODEQ-approved CAFO, which requires, among other things, the preparation of a feasibility study and provides for a CERCLA-Quality Cleanup for the County roads and bridges to be determined by ODEQ. This establishes a sufficient connection to a cleanup to make BZC's costs recoverable under Tenth Circuit law. *Young*, 394 F.3d at 863-65. BZC's response action has fully complied with the requirements of the NCP, including the documentation of response costs, public participation requirements, and the performance of an environmental investigation. 40 C.F.R. § 300.700(c)(3)(i).

108.   The County's liability for BZC's recoverable response costs under CERCLA § 107(a) is joint and several, but subject to equitable allocation based upon the Court's weighing of the relevant equitable factors, which may include, *inter alia*, the ability of the parties to demonstrate their specific contribution to a release; amount of waste involved; the degree of toxicity of the waste; the degree of involvement the party had with the release; the degree of care exercised by a party; the degree of cooperation with government officials; the party's level of culpability; the degree to which the party benefitted from disposal of the waste; the party's ability to pay its share of the cost; the

party's economic benefits due to the cleanup; adherence to the applicable industry standards of care; cooperation and assistance with investigation and remediation of the contamination; the party's awareness of the environmental issues; and any other factors determined to be relevant by the Court.

109.    Based on the weighing of these equitable factors, a portion of BZC's response costs, in an amount to be determined by the Court, should be allocated to the County.

110.    BZC is entitled to a "declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages" against the County.  42 U.S.C. § 9613(g)(2).

111.    BZC is not liable to the County under 42 U.S.C. § 9607(a)(1)-(4) as a current owner and operator, owner or operator at the time of disposal, arranger, or transporter.

112.    The County has not incurred any recoverable costs of response under CERCLA.

113.    Any "response costs" allegedly incurred by the County are not "necessary" under CERCLA.

114.    Any "response costs" allegedly incurred by the County were not incurred or documented consistently with the NCP and are therefore unrecoverable under CERCLA.

115.    The County is not entitled to a declaratory judgment of future liability against BZC.  42 U.S.C. § 9613(g)(2).

116.    Defendants have not included in this Final Pretrial Report contentions relating to Plaintiff's claims dismissed by this Court's summary judgment order (Doc. # 177). Defendants, however, incorporate by reference all contentions expressed in Defendants' Motion for Partial Summary Judgment and Brief in Support (Doc. ## 103 & 104), Reply in Support of Motion for Partial Summary Judgment (Doc. # 147), and Response to Plaintiff's Motion for Partial Summary Judgment (Doc. # 129).

## 6.    **EXHIBITS**

Unlisted exhibits will not be admitted unless, by order of the court, the final pretrial order is amended to include them.

A.    Plaintiff:

A copy of Plaintiff Kay County's Final Exhibit List [Doc. No. 77] is attached

hereto as Exhibit 1.   A copy of Plaintiff Kay County's Objections to Defendants' Second Amended Final Trial Exhibit List [Doc. No. 138] is attached hereto as Exhibit 2.

      B.     <u>Defendant</u>:

A copy of Defendants' Second Amended Final Trial Exhibit List (Doc. # 127) is attached hereto as Exhibit 3.   Defendants' Objections to Plaintiffs' Exhibit List (Doc. #128) is attached hereto as Exhibit 4.

**7.**    **<u>WITNESSES</u>**

Unlisted witnesses in chief will not be permitted to testify unless, by order of the court, the final pretrial order is amended to include them.

      A.     <u>Plaintiff</u>:

A copy of Plaintiff Kay County's Final Witness List [Doc. No. 76] is attached hereto as Exhibit 5.

      B.     <u>Defendant</u>:

A copy of Defendants' Final List of Trial Witnesses (Doc. # 98) is attached hereto as Exhibit 6.

**8.**    **<u>ESTIMATED TRIAL TIME</u>**

      A.     Plaintiff's Case:     8 days

      B.     Defendant's Case:     8 days

**9.**    **<u>BIFURCATION REQUESTED</u>**     Yes   <u>  X  </u>     No  <u>        </u>

The Court has ordered that the parties' claims under CERCLA will be determined by a non-jury trial (Doc. #156).

Defendants have filed a motion for bifurcation, seeking a separate bench trial, or alternatively, a separate jury trial, on Plaintiff's theory that Cyprus Amax, FMC, and FCX are liable for BZC's liability on a veil-piercing or alter ego theory (Doc. # 169). Plaintiff objects and has requested a jury trial on these issues [Doc. No. 181].   That motion remains pending.

10.    **<u>POSSIBILITY OF SETTLEMENT</u>**

Good _____      Fair _____      Poor \_\_\_X\_\_\_\_


     All parties approve this report and understand and agree that this report supersedes all pleadings, shall govern the conduct of the trial, and shall not be amended except by order of the Court.

     Respectfully submitted, Tuesday, October 1, 2013.



          *s/Phillip G. Whaley*
          Patrick M. Ryan (OBA No. 7864)
          Donald K. Shandy (OBA No. 11511)
          Phillip G. Whaley (OBA No. 13371)
          Stephen C. Gelnar (OBA No. 18381)
          Patrick R. Pearce, Jr. (OBA No. 18802)
          RYAN WHALEY COLDIRON SHANDY PLLC
          900 Robinson Renaissance
          119 North Robinson
          Oklahoma City, OK  73102
          Ph:    (405) 239-6040
          Fax:    (405) 239-6766
          Email:  pwhaley@ryanwhaley.com

          -and-

          James L. Menzer (OBA No. 12406)
          MENZER LAW OFFICES, P.C.
          211 West Blackwell Avenue
          P.O. Box 818
          Blackwell, OK  74631-0818
          Ph:    (580) 363-0800
          Fax:    (580) 363-0801

          Dan Cavett
          CAVETT AND FULTON PC
          6035 E. Grant Road
          Tucson, AZ  85712

_s/Morgan L. Copeland, Jr._
Reid E. Robison (OBA No. 7692)
Timothy J. Bomhoff (OBA No. 13172)
MCAFEE & TAFT
A PROFESSIONAL CORPORATION
Two Leadership Square
211 North Robinson Avenue, Suite 1000
Oklahoma City, OK  73102-7103
Ph:     (405) 235-9621
Fax:    (405) 235-0439

Morgan L. Copeland, Jr.
Robert M. Schick
Lewis C. Sutherland
Tracey R. Keegan
Stacy M. Neal
Taylor R. Pullins
VINSON & ELKINS L.L.P.
First City Tower, Suite 2500
1001 Fannin Street
Houston, TX 77002-6760
Ph:     (713) 758-2222
Fax:    (713) 758-2346

Sandra G. Rodriguez
VINSON & ELKINS L.L.P.
2801 Via Fortuna, Suite 100
Austin, TX  78746
Ph:     (512) 542-8400
Fax:    (512) 542-8612

Kevin A. Gaynor
(_pro hac vice_ application pending)
Benjamin S. Lippard
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037-1701